[No. S005502. Aug. 21, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID KEITH ROGERS, Defendant and Appellant.

834

**Counsel**

A. J. Kuchins, under appointment by the Supreme Court; Denise Anton; Howard, Rice, Nemerovski, Canady, Falk & Rabkin and Alan W. Sparer for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—A jury convicted defendant David Keith Rogers of the first degree murder of Tracie Clark and the second degree murder of Janine Benintende (Pen. Code, §§ 187, 189),[1] and found true the special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)) and the allegation that defendant personally used a handgun in the commission of each murder (§ 12022.5). At the penalty phase of the trial, the jury returned a verdict of death for the Clark murder. The trial court denied defendant's automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed the death sentence for the Clark murder and 15 years to life in prison for the Benintende murder.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

A. *Introduction*

Defendant, a Kern County Sheriff's deputy, murdered 20-year-old Janine Benintende in January 1986 and 15-year-old Tracie Clark on February 8, 1987. Both of the women had been working as prostitutes on Union Avenue in Bakersfield when they were killed. Both bodies were found in the Arvin-Edison Canal. Both had been shot multiple times with bullets from a .38-caliber weapon. Bullets recovered from the women's bodies, tire tracks and shoe prints at the scene of the Clark murder, and an eyewitness account connected defendant to the murders. Upon his arrest, and after waiving his rights to an attorney and to silence, defendant confessed to the Clark murder, but not the Benintende murder. At trial, the defense claimed defendant suffered from a mental illness resulting from extensive physical and sexual abuse as a child and, as a result, did not form the mental state or states required for the charged crimes.

At the penalty phase, the prosecution presented evidence of two additional incidents involving defendant and prostitutes. The defense presented further evidence of defendant's background and mental state.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

B. *Guilt phase*

1. *The prosecution's case*

a. *The killing of Janine Benintende*

In January 1986, 20-year-old Janine Benintende resided in Los Angeles. Benintende had been using heroin and working as a prostitute. That month, Benintende began associating with Frank Bybee. Around January 22, 1986, Benintende appeared nervous and told her mother she needed to leave Los Angeles for a few days. She left with Bybee and went to Bakersfield.

About 7:30 or 8:00 p.m. on the day of their arrival in Bakersfield, Benintende went to Union Avenue intending to work as a prostitute. She was wearing pants, boots, and a white rabbit fur jacket. Bybee never saw Benintende again.

On February 21, 1986, a farmer noticed a body floating in the Arvin-Edison Canal near Rock Pile Road. Kern County Sheriff's Homicide Detective Mike Lage was called to the scene. He searched the area for footprints or other evidence but found nothing significant. Three days later, Dr. John E. Holloway, a forensic pathologist for the Kern County Coroner's Office, examined the body, which by that time had undergone extensive decomposition. Among the items worn by the deceased were a white rabbit fur jacket and jeans. Dr. Holloway concluded the person had been shot once near the sternum and twice in the back. There was only one entry wound in the back, just below the left shoulder blade, where both bullets apparently had entered. The gunshot wounds were the cause of death. Two bullets were retrieved from the body. The body was identified as Benintende's through fingerprint analysis.

Detective Lage contacted Benintende's relatives and friends as well as the Los Angeles Police Department, but was unable to come up with any suspects in her murder.

b. *The killing of Tracie Clark*

Connie Zambrano worked as a prostitute on Union Avenue in Bakersfield. In the early morning hours of February 8, 1987, Zambrano saw a girl, whom she had not seen before, enter a beige Ford pickup truck with a brown camper shell and dark bubble windows. The girl appeared to point to a motel, but the truck instead proceeded straight before stopping for a few minutes on a side street, then heading out of town. Zambrano recognized the truck and its driver, whom she had seen and spoken to many times on Union Avenue.

Zambrano once had a "date" with him; he had paid her $20 for sex. At trial, Zambrano identified the driver as defendant.

On the afternoon of February 8, 1987, two farmers were shooting squirrels when they saw a "half-naked" woman's body submerged in a few feet of water in the Arvin-Edison Canal a short distance from the Hermosa Road Bridge. Summoned to the scene, sheriff's investigators saw the body face-down in the water about 50 feet south of the bridge. Searching the scene, the investigators found tire tracks and shoe prints in the dirt shoulder of the eastbound lane (on the south side) of Hermosa Road, east of the canal. A LifeStyles Contour condom and condom wrapper were on the ground in that area. There was a pool of blood in the center of the eastbound lane of the road east of the bridge. A bloody shoe print was in the road near the pool. Spots of blood led from that pool across the road to an area near a telephone pole in the dirt shoulder of the westbound lane (on the north side) of Hermosa Road. There was a "disturbance impression" in the dirt embankment east of the telephone pole. A trail of smeared blood led from the pool of blood west to the center of the bridge over the canal. There were blood spots on the bridge, on the cement curb of the canal, and on the rail of the canal.

A pathologist for the Kern County Coroner's Office examined the body and found a number of gunshot wounds. Two shots had entered the front of the chest near the right breast, penetrating the lungs. One bullet had passed through the body, while the second had lodged near the center of the back. A third shot had grazed the right side of the chest. A fourth shot, which had been fired at fairly close range, had entered the right side of the chest, passed through several organs, and lodged in the left side of the body. A fifth shot had grazed the right side of the abdomen near the waistline without entering the body cavity. A sixth shot had entered the back near the midline and lodged near the right collarbone. There also were abrasions on the buttocks that were consistent with the body being dragged after death. The pathologist concluded the victim bled to death from the multiple gunshot wounds and probably died before her body was placed in the water.

c. *The investigation and defendant's confession*

In an attempt to identify the body found in the canal, detectives showed photographs of it to sheriff's deputies. Sheriff's Deputy Martin Williamson showed a photograph to defendant, who said he did not recognize the person.

The following day, Deputy Williamson and Detective John Soliz, the lead investigator on the case, went to Union Avenue to learn whether any of the prostitutes there could identify the body depicted in the photos. Connie

Zambrano told Detective Soliz she recognized the victim as the girl she had seen entering the truck the night before. Another prostitute identified the victim as Tracie Clark.

That same day, criminalists compared the three bullets recovered from Clark's body with the two bullets recovered from Benintende's body the year before. The bullets matched: all were .38-caliber semi-copper-clad hollow-point bullets, all were of the same type as sheriff's-department-issue ammunition that was available to all deputies, and all had been fired from the same weapon. The ammunition also was sold commercially.

Detective Lage and Detective William Nikkel went to defendant's house that day and compared the tires on his truck with photos of the tire tracks found at the Clark murder scene. Finding the tires and tracks matched, the detectives drove Zambrano past defendant's house, where she identified defendant's truck as the truck she had seen Clark enter. She also picked defendant's photograph out of a photo lineup consisting of photos of six sheriff's deputies. At that time, she did not know defendant was a deputy sheriff.

Kern County District Attorney's Office investigator Tam Hodgson obtained warrants for defendant's arrest and the search of his house. Officers arrested defendant soon thereafter. Defendant's shoes appeared to match photos of the shoe prints at the scene. Once in custody, defendant agreed to be interviewed. Investigator Hodgson and Detectives Soliz and Lage questioned defendant on February 13 and 14, 1987. At the outset of the first interview, defendant waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], then admitted shooting Clark and described the following events.

According to defendant, he picked up Clark near the El Don Motel at the corner of South Union Avenue and Belle Terrace in the early morning hours. Defendant was driving a Ford pickup truck with a brown-and-white camper shell, which he had purchased toward the end of the previous year.[2] Clark appeared to him to be a "Mexican female," about 20 to 30 years old and about 140 to 150 pounds.[3] She asked whether he wanted a "date"; he said, "I don't know." Clark entered the truck, and defendant drove about one block east on Belle Terrace, then stopped. They agreed on a price of $30 for oral sex. Defendant wanted to go out in the "country" rather than to Clark's motel, and she agreed.

---

[2] Toby Coffey confirmed he sold defendant a beige Ford pickup truck with a camper shell in December 1986. Defendant took possession of the vehicle a few weeks later.

[3] According to Clark's death certificate, she was born on June 10, 1971, and was Black.

Defendant said he drove for about 15 to 20 minutes.[4] On the way, Clark told defendant her name was Anna and that she was from Cuba or Puerto Rico. She also began complaining about how far out of town they were going. Defendant parked at a spot on the south side of Hermosa Road where there was "nobody around." He then lay down on the seat of the truck's cab, and Clark kneeled over him and began to perform fellatio on him. Defendant could hear coins or keys rattling in her pockets. Clark had brought a condom, which was lying in the truck. Defendant's pants were around his ankles.

After awhile, according to defendant, Clark stopped and demanded to be paid $50 instead of $30 because they had gone so far out of town and the liaison was taking so much of her time. When defendant refused, Clark became angry and started swinging at him. He told her to "knock this shit off." Instead of complying, she began yelling and kicking him. Defendant was afraid Clark might scratch his face with her long fingernails. With his left hand, defendant (who was right-handed) reached under the front seat and retrieved a .38-caliber revolver he had stored there. He pulled back the hammer and pointed the gun at Clark, hoping it would "make her quit," but it did not. Instead, she continued to swing at him and kick him. The gun went off, wounding Clark.

According to defendant, Clark then fell back against the truck door, screaming. Defendant started the truck and began driving, telling her he would get her back to town. When she continued to scream, defendant stopped the truck, unlatched the passenger side door, and pushed her out with his feet. She ran around in front of the headlights, "screaming and hollering." Defendant noticed blood on the right side of her rib cage. He put on his pants, got out of the truck, and told her he would take her to town and get her a cab to go to the hospital. But she started "going crazy" again and said she was going to "report" him. Defendant "panicked" and shot her again, this time with the gun in his right hand.

Defendant said Clark then ran up the road. Defendant realized if she turned him in, he would be arrested and go to jail. As Clark leaned against an embankment facing him, defendant shot her four more times, "empt[ying] the gun." Defendant shot her because she could not testify against him if she were dead, and "that was the bottom line." Clark ran into the road, then fell down.

Defendant said he then drove away but came back shortly. He determined Clark no longer was breathing, and then dragged her body by the ankles to a

---

[4] Investigator Hodgson drove the route defendant described in 14 minutes. The distance was 11 miles.

nearby bridge and pushed it over the cement railing into the canal. He then drove home, dropping the shell casings on the way. Once home, he threw the gun into a black bag in the back of his truck, watched television, and went to bed. The following day, he drove back to the scene. "It didn't look good." There was blood in the road.

Defendant said he had purchased the murder weapon, a short-barreled .38-caliber revolver, about six years earlier from a man at the Four Queens bar on Edison Highway. He had fired it only once before. During the interview, one of the investigators asked defendant about the Benintende killing. Defendant at first repeatedly denied having shot anyone other than Clark, but later said he could not remember.

A search of defendant's home turned up ammunition of the same type issued by the sheriff's department to its deputies and used in the killings, as well as several expended .38-caliber shell casings. Investigators thoroughly examined defendant's beige pickup truck but found no bloodstains. In the camper they found a black canvas bag with several guns in it, including a .38-caliber Colt Detective Special. Criminalist Gregory Laskowski test fired that weapon and compared the resulting bullets to those retrieved from the bodies of Clark and Benintende. The bullets had matching characteristics, leading him to conclude the bullets that killed both Clark and Benintende had been fired from that gun. After comparing crime scene photographs with the tires on defendant's truck and defendant's shoes, Laskowski concluded those tires and shoes made the tracks depicted in the photos.

Laskowski searched defendant's green Datsun truck for evidence of the Benintende killing but found nothing significant. Although Benintende had been wearing a rabbit fur jacket when she died and there was rabbit fur in the truck, that fur could have come from a pair of gloves in the truck. Laskowski also examined Clark's clothing. Inside the pockets of her blue skirt he found a key, some coins, a $20 bill, and a package of LifeStyles Contour condoms.

Investigator Hodgson determined the murder weapon had been reported stolen several years earlier. Defendant had written the theft report. Hodgson then tracked down the Four Queens bartender from whom defendant said he had purchased the murder weapon. The bartender, Steven Howell, never had sold defendant a gun. The murder weapon had belonged to Ahmed Li Ubadi, the manager of a Stop and Shop Market. He last saw the gun before his store was burglarized in 1982. A deputy sheriff had gone to the store to investigate the burglary. When Mr. Ubadi arrived at the store, the only thing missing was the gun.

### d. *Other evidence*

Katherine Hardie, a prostitute known as "Redbone," saw Benintende on Union Avenue shortly before she disappeared in late January 1986. Sometime after August 1986, a man driving a white pickup truck with a camper shell picked up Hardie on Union Avenue. She asked him whether he wanted a "date." The driver would not go where Hardie wanted, and instead tried to drive her "out to the orchard." When he would not let her out of the truck, Hardie had to jump out.

### e. *Motion for partial acquittal*

At the close of the prosecution's case-in-chief, the trial court granted defendant's motion for partial acquittal on the Benintende count and reduced that charge to second degree murder. Thereafter the court instructed the jury it had "reached a determination that so far as the homicide of Janine Benintende [is] concerned that the jury could reach no greater verdict than murder in the second degree. In other words, so far as that second count is concerned, first degree is no longer a possibility with this jury."

## 2. *The defense case*

Defendant testified in his own defense and admitted killing Clark. The defense centered around defendant's claim he did not form the intent required for the charged crimes due to a mental disturbance stemming from the sexual and physical abuse he had suffered as a child. The defense evidence consisted primarily of defendant's testimony and that of three mental health professionals.

Dr. David Bird, a clinical psychologist, began treating defendant for depression in February 1987 after defendant's arrest for the Clark murder. Over the course of a year, Dr. Bird met with defendant approximately 48 times. According to Dr. Bird, defendant suffered from periods of amnesia regarding his childhood. Because memory loss is typical for children who have suffered sexual abuse, Dr. Bird believed there had been a great deal of trauma in defendant's early life.

Dr. Bird described defendant's family history, which he developed by speaking with defendant and through input from his cotherapist, Dr. Joan Franz. According to Dr. Bird, defendant's parents, Juanita and James, both were alcoholics. When defendant was approximately six months of age, his parents divorced. Juanita then married Dub Ellis, another alcoholic. From that point forward, defendant resided in a "house of horrors" of physical and sexual trauma. Juanita would hit defendant and his brother Dale with a belt.

Ellis was a "sexual sadist." For example, Ellis would force defendant and Dale to play a game called "turn and burn" in which the boys, while naked, had to grasp each other either back-to-back or face-to-face. Ellis then hit them with a belt with a silver buckle whenever one boy could turn the other boy toward Ellis. This caused bruises and welts on the boys' buttocks, legs and testicles. Once, after discovering Juanita had dressed defendant in women's panties and clothing, Ellis forced defendant to stay outside, where he was fearful of being seen. Ellis also once threatened to kill defendant by throwing him into a river.

Dr. Bird testified that when defendant was approximately six or seven years of age, a new stepfather, William, appeared. William, a homosexual, sodomized defendant on a nightly basis. Defendant also was sexually abused and sodomized by other men in the house.

Between the ages of 11 and 16 years, Dr. Bird related, defendant was seduced by an older female cousin and by his father's wife, Barbara, an African-American. Defendant began collecting women's underwear. When defendant was 17 or 18 years of age, he attempted to reconcile with his father, but Barbara excluded him from the house when he refused to become sexually involved with her.

According to Dr. Bird, defendant joined the Navy at the age of 19 years and began drinking heavily. He left the Navy two years later. Defendant had two unsuccessful marriages before meeting and marrying his current wife, Joyce. He had two sons by his first wife. At some point, defendant began compulsively associating with prostitutes.

In Dr. Bird's view, defendant had extreme sexual problems due to his background and suffered from a possible multiple personality disorder, fragmentation, and dissociation. On standard psychological tests, defendant scored above average in intelligence but showed suicidal tendencies.

Dr. Joan Franz, a psychotherapist, testified she shared a practice with Dr. Bird and began seeing defendant to treat him for his depression after his arrest for the Clark murder. Over the course of a year, Dr. Franz saw defendant once a week for two to three hours each visit.

Dr. Franz gained information concerning defendant's background from defendant, his brother Dale, other family members, and defendant's investigator. Based upon that information, Dr. Franz opined defendant's family had no moral structure. Emotional abuse, neglect, and abandonment characterized his early family life. Dr. Franz testified that defendant suffered both overt and covert sexual abuse; he was cross-dressed by his mother, abused by older cousins, and sodomized by a man wearing a rubber glove with two of the fingers cut off.

In Dr. Franz's opinion, defendant fit the profile of a survivor of child sexual abuse and an adult victim of trauma. The trauma and abuse defendant suffered as a child led to sexual problems as an adult, including impotence and "acting out" sexually. Dr. Franz also stated defendant had multiple personalities. She believed defendant began associating with prostitutes because he identified with them and also to prove to himself he was heterosexual.

Dr. David Glaser, a psychiatrist, testified he first met defendant in December of 1987. At that time, defendant could not remember what had happened from the time he first shot Clark until he saw her lying in a pool of blood. In order to get at the areas of memory loss, Dr. Glaser administered sodium amytal, a short-acting barbiturate that "disinhibits" the brain and allows a person to access repressed information. In interviews conducted both with and without sodium amytal, defendant recounted "a museum of childhood sexual and physical abusive traumas" beginning from the age of four or five years. Dr. Glaser believed defendant's psychological profile was most consistent with the phenomenon of "dissociative states" in which a person is not fully in control of his or her thoughts, feelings, or behavior. Individuals with dissociative disorders are aware of the occurrence of lost periods of time or memory lapses. Sexual abuse is a predisposing factor for dissociative disorders.

Defendant testified concerning the Clark killing, stating he independently could recall only what occurred up until the time he pushed Clark out of the truck with his feet. After that, his recollection was based upon his viewing of the videotape of the sodium amytal interview. Defendant related the following.

He testified he was driving his pickup truck along Union Avenue about 2:00 a.m. and observed Clark at the corner of Belle Terrace and Union, a location frequented by prostitutes. Defendant had not seen Clark before. She appeared to be between 20 and 30 years of age. He stopped at the corner and opened the passenger door. Clark entered the vehicle and asked whether he wanted a "date," which meant she was looking for a customer. Defendant drove around the corner and stopped. Clark wanted to go to a motel but defendant did not, because he did not want to be "rolled" by a pimp. Clark agreed to go out to the "country" instead. The two decided on $30 for a "half-and-half," which is half oral sex and half sexual intercourse.

Defendant stated he drove for approximately 15 to 20 minutes. When they reached Hermosa Road, defendant stopped and lay down in the front seat of the truck, and Clark began giving him oral sex. Defendant did not have an erection; he "sometimes ha[d] problems with that." When Clark asked what

was wrong, defendant told her to "work at it a little more." Clark became angry. Defendant was feeling "sort of embarrassed, sort of crushed." Clark became abusive and waved her arms around. She asked whether he preferred little boys. Defendant said he liked girls and women, and maybe she was not doing her job right.[5] Clark called him "queer" and "faggot." Defendant opened the passenger door and pushed her out with his feet. Clark was walking toward him pointing her finger at him, and he felt threatened, so he pointed a gun at her, pulled the trigger, and shot her. A second or two later, he shot her five more times. Defendant was thinking only of protecting himself. He feared her and her reporting him. There was no argument concerning money.

Defendant testified that after he shot Clark, she said, "Oh God." Then she walked into the middle of the road, lay down, and died. Defendant drove down the road and then came back to see whether she was alive. Finding her dead, he dragged her body to the canal and placed it in the water. Defendant drove home and threw the gun into the back of his truck. At home, he wandered around the house and watched some television, feeling confused. Later that same day, he returned to the scene of the killing to try to figure out what had happened. He saw a pool of blood in the road, blood spots, tracks, and a body in the canal. At that point he knew he had killed Clark.

Defendant said he went to work the next few days and did not tell anyone about the killing. He was arrested the following Friday afternoon. After waiving his *Miranda* rights, he gave a statement concerning the Clark killing. He provided the authorities with "enough" information to ensure he would be convicted and executed. Some of the things he told them—for example, that he possibly discussed calling a taxicab after he first shot Clark—were not true. Defendant was depressed and suicidal at the time.

In Dr. Glaser's opinion, at the time of the killing defendant "was overwhelmed with numerous affective states specifically stemming from his sexual dysfunction and specifically the volley of expletives that followed such dysfunction from Miss Clark," and "the actual shooting and killing was an impulsive heat of passion event" that occurred without planning. In this emotional state, defendant was incapable of premeditating and deliberating or of coldly weighing the consequences of killing Clark. Further, defendant's confession was "part of his larger scheme to essentially either commit suicide at his own hand or commit legal suicide by insuring his demise by, as he puts it, coming up with the perfect first degree murder conviction story."

Dr. Bird agreed the killing of Clark was an impulsive, emotional act of passion and fear. It was a sexual incident and had nothing to do with money.

---

[5] Defendant testified he sometimes feared he was inclined toward homosexuality.

There was no planning or deliberation, just a reaction to a "rush of happenings," including being called names by a woman who looked like his stepmother Barbara. There was no "thoughtful advance planning or anticipation of doing what he did," no reasoning or thinking, and no weighing of consequences.

In Dr. Franz's opinion as well, defendant killed Clark in a very emotional, anxious state in which he did not have the "skills available" to premeditate and deliberate. Defendant simply reacted to the names Clark was calling him. The killing was "not a weighing or a balancing, but simply a defense mechanism to protect himself," an emotional act. "It was basically, you would call it survival."

### 3. *The prosecution's rebuttal*

The only evidence presented by the prosecution in rebuttal was testimony that in February of 1983, defendant briefly had been terminated from his position at the sheriff's department as the result of a complaint by a prostitute, but subsequently had been reinstated.

## C. *Penalty phase*

### 1. *The prosecution's case in aggravation*

Ellen Martinez, the prostitute whose complaint against defendant was the subject of the prosecution's guilt phase rebuttal, testified regarding the events in early 1983 that led to the complaint. Martinez testified that defendant at that time, while on duty, had stopped her while she was having sex with a customer in a cemetery outside Bakersfield. The customer was allowed to leave, but defendant placed Martinez in his patrol car and told her he was going to take her "downtown." When Martinez could not locate her underwear, defendant went to look for it in the cemetery, but was unsuccessful. Defendant then told Martinez to undress, and took photographs of her breasts and vaginal area. Afterwards, defendant dropped Martinez off near her motel room.

Tambri Butler, also a Union Avenue prostitute, testified defendant assaulted her in February 1986. According to Butler, defendant picked her up in a white pickup truck, forced her to perform various sex acts by shocking her with a "stinger" gun and firing an automatic weapon across the bridge of her nose, and then pushed her out of the truck and tried to run her over.

Investigator Hodgson testified a black, Excam brand, .25-caliber automatic pistol, admitted without objection as exhibit 1, was taken from the black bag found in defendant's truck.

### 2. *The defense case in mitigation*

Dr. Bird testified concerning the videotape of defendant's interview with Dr. Glaser conducted while defendant was under the influence of sodium amytal. The videotape was played for the jury. On the tape, defendant told the same story of the Clark murder he had told at trial. He also stated, "I hurt for the girl [Clark] I killed." Dr. Bird reiterated his opinion that defendant was under "extreme emotional distress" when he shot Clark, and that the lifetime of abuse he had suffered made it difficult for him to conform his conduct to the law. In Dr. Bird's opinion, defendant was an emotionally impaired person.

Defendant's wife (Joyce Rogers), stepdaughter (Carol Truitt), and brother (Dale Rogers) testified regarding defendant's qualities as a loving husband, father, grandfather, and brother. Seven law enforcement officers, including defendant's former beat partner, testified defendant was a skilled and conscientious deputy sheriff who was able to defuse emotionally charged situations, and described him as a good friend. Several of the officers testified defendant always had appeared normal.

## II. DISCUSSION

### A. *The trial court's failure to conduct a hearing into defendant's competence to stand trial*

Defendant claims the trial court's failure (both before and during the trial) to inquire into, and to conduct a hearing regarding, his competence to stand trial and to assist counsel in his defense, violated his right to due process of law under the Fourteenth Amendment to the United States Constitution, as well as his rights under sections 1367 and 1368. Defendant claims this failure also violated his right to be mentally present at the proceedings, both under the confrontation clause of the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution and state statutory law. (See § 1043; *In re Dennis* (1959) 51 Cal.2d 666, 672 [335 P.2d 657]; *People v. Berling* (1953) 115 Cal.App.2d 255, 267–268 [251 P.2d 1017].) We reject these contentions.

■ Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. (§ 1367; *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 384–386 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Ramos* (2004) 34 Cal.4th 494, 507 [21 Cal.Rptr.3d 575, 101 P.3d 478].) A defendant is incompetent to stand trial if he or she lacks a " 'sufficient present ability to consult with his lawyer with a reasonable

degree of rational understanding—and . . . a rational as well as a factual understanding of the proceedings against him.' " (*Dusky v. United States* (1964) 362 U.S. 402, 402 [4 L.Ed.2d 824, 80 S.Ct. 788]; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399–400 [125 L.Ed.2d 321, 113 S.Ct. 2680]; § 1367; *People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. (§ 1368; *Drope v. Missouri, supra,* 420 U.S. at p. 181; *Pate v. Robinson, supra,* 383 U.S. at pp. 384–386; *People v. Blair* (2005) 36 Cal.4th 686, 711 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; *People v. Pennington* (1967) 66 Cal.2d 508, 516–517 [58 Cal.Rptr. 374, 426 P.2d 942].) The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. (*Drope v. Missouri, supra,* 420 U.S. at p. 180; *People v. Ramos, supra,* 34 Cal.4th at pp. 507–508.) But to be entitled to a competency hearing, "a defendant must exhibit more than . . . a preexisting psychiatric condition that has little bearing on the question . . . whether the defendant can assist his defense counsel." (*People v. Ramos, supra,* 34 Cal.4th at p. 508; see also *People v. Danielson, supra,* 3 Cal.4th at p. 727.)

A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial. (See *People v. Danielson, supra,* 3 Cal.4th at p. 727; see also *Drope v. Missouri, supra,* 420 U.S. at p. 181.) The failure to declare a doubt and conduct a hearing when there is substantial evidence of incompetence, however, requires reversal of the judgment of conviction. (*Drope v. Missouri, supra,* 420 U.S. at p. 181; *Pate v. Robinson, supra,* 383 U.S. at pp. 384–386; *People v. Blair, supra,* 36 Cal.4th at p. 711.)

Defendant contends there was substantial evidence of his incompetence before the trial court. Defendant first points to testimony, received both during the preliminary hearing and later during the guilt phase, indicating that defendant was depressed and suicidal in jail and had been placed on a suicide watch. Dr. Bird testified defendant scored extremely high on psychological tests designed to assess suicide risk. Dr. Glaser and Dr. Franz agreed defendant was an extreme suicide risk. Although the risk was most elevated

immediately following defendant's arrest, the summer before trial defendant had hoarded razor blades and strips of cloth in his jail cell. Dr. Franz testified the suicide risk continued up until the time of trial.

Actual suicide attempts or suicidal ideation, in combination with other factors, may constitute substantial evidence raising a bona fide doubt regarding a defendant's competence to stand trial. (See *Drope v. Missouri, supra,* 420 U.S. at pp. 166–167, 179–180; *Moore v. United States* (9th Cir. 1972) 464 F.2d 663, 665–666; see also *Pate v. Robinson, supra,* 383 U.S. at p. 381.) Nonetheless, in contrast to the cases cited above, here defendant's suicidal tendencies did not constitute substantial evidence of incompetence, for they were not accompanied by bizarre behavior, the testimony of a mental health professional regarding competence, or any other indications of an inability to understand the proceedings or to assist counsel. (Cf. *People v. Ramos, supra,* 34 Cal.4th at p. 509 [defendant's hoarding of medication in apparent preparation for a suicide attempt did not give rise to a doubt regarding his competence to stand trial].)

Defendant points out that his counsel moved to suppress his tape-recorded confession on the ground defendant was not "psychologically fit" to waive his *Miranda* rights after his arrest and was "not in a position to give free and voluntary consent." Defendant also notes his counsel's argument during opening statements that defendant suffered from "extreme mental problems." Counsel never suggested, however, that defendant's alleged inability to consent to interrogation gave rise to a doubt concerning his competence to stand trial. Although trial counsel's failure to seek a competency hearing is not determinative (see *Odle v. Woodford* (9th Cir. 2000) 238 F.3d 1084, 1088–1089), it is significant because trial counsel interacts with the defendant on a daily basis and is in the best position to evaluate whether the defendant is able to participate meaningfully in the proceedings (see *id.* at p. 1088).

Defendant argues there was substantial evidence of incompetence in the guilt phase testimony demonstrating that he suffered from long-standing mental problems. All three defense mental health experts agreed defendant suffered some type of dissociative disorder—a "a splitting off of [defendant's] mind" into different directions—which possibly rose to the level of a multiple personality disorder.[6] No medical expert, however, testified defendant was

---

[6] The Diagnostic and Statistical Manual of Mental Disorders explains "dissociative disorders" in part as follows: "The essential feature of the Dissociative Disorders is a disruption in the usually integrated functions of consciousness, memory, identity, or perception. The disturbance may be sudden or gradual, transient or chronic." (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000, text rev.) p. 519.) Dissociative amnesia and dissociative identity disorder (formerly multiple personality disorder) are examples of dissociative disorders. (*Ibid.*)

likely to dissociate during the trial. Rather, the testimony suggested defendant's dissociative states were triggered by traumatic events such as childhood sexual abuse or Clark's verbal abuse. Likewise no medical expert ever related defendant's alleged multiple personality disorder to any inability to understand the trial process or assist his attorneys.

Defendant also points to evidence establishing that he twice was exposed accidentally to the drug phencyclidine (PCP) on the job, causing serious temporary brain impairment and dissociation. The testimony suggests, however, the effects of the PCP exposure were temporary. There was no testimony the brief exposure affected defendant's competence to stand trial.

Finally, defendant argues that a doubt concerning his competence should have been raised by the evidence suggesting he could not recall various events in his childhood and those surrounding the killing of Clark and Benintende. We never have held that memory loss regarding the charged crime renders a defendant unable to assist in his or her defense. (Cf. *People v. Frye* (1998) 18 Cal.4th 894, 948–952 [77 Cal.Rptr.2d 25, 959 P.2d 183] [testimony establishing defendant had a mild memory impairment that made it difficult for him to recapture memory and to retain information, and also that he might have brain damage, was not substantial evidence of incompetence].) Moreover, the question whether defendant genuinely could not remember the events surrounding the crimes was disputed at trial, and there was evidence demonstrating defendant had recovered some memories through the sodium amytal interview. There was no testimony suggesting defendant's memory loss affected his ability to understand the proceedings or assist his counsel. Accordingly, here the mental health testimony was similar to the kind of " ' "psychiatric testimony . . . with little reference to defendant's ability to assist in his own defense" ' " that we have found insufficient to raise a doubt regarding a defendant's competence to stand trial. (*People v. Danielson, supra,* 3 Cal.4th at p. 727.)

The trial court had the opportunity to observe defendant's testimony and demeanor during the trial. Defendant's intelligence was above average. Defendant testified coherently and articulately, and there was nothing in his testimony that would have caused the trial court to question whether he was unable to understand the proceedings or cooperate with counsel.

In sum, defendant's "history, statements and conduct did not approach the overwhelming indications of incompetence" present in *Drope* and other cases. (*Davis v. Woodford* (9th Cir. 2004) 384 F.3d 628, 646; see also *People v. Ramos, supra,* 34 Cal.4th at p. 509.) Considering all the evidence before the trial court, there was no substantial indication of incompetence requiring the trial court to declare a doubt and conduct a competence hearing. For the same

reasons, defendant has not shown he was mentally absent from the trial in violation of his rights under the state or federal Constitutions or state statutory law.[7] (See § 1043; *In re Dennis, supra,* 51 Cal.2d at p. 672; *People v. Berling, supra,* 115 Cal.App.2d at pp. 267–268.)

### B. *Joinder of the Clark and Benintende counts*

Defendant was charged in a single information with the killings of Clark and Benintende. Defendant did not move to sever the two counts. Defendant now claims the joinder of the Clark and Benintende charges resulted in gross unfairness, depriving him of his federal constitutional rights to due process, a fair trial, and equal protection of the law.

Section 954 governs joinder and severance, providing in pertinent part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." Defendant concedes the statutory requirements of joinder were met—the two murder counts charged crimes of the same class (see *People v. Catlin* (2001) 26 Cal.4th 81, 100 [109 Cal.Rptr.2d 31, 26 P.3d 357]) and were connected by a common murder weapon—and acknowledges his failure to move to sever the counts at trial forfeited any claim that the trial court abused its discretion in denying severance. (See *People v. Maury* (2003) 30 Cal.4th 342, 392 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Hawkins* (1995) 10 Cal.4th 920, 939–940 [42 Cal.Rptr.2d 636, 897 P.2d 574].) He further acknowledges the

---

[7] With respect to this and virtually every other claim raised on appeal, defendant urges that the error or misconduct he is asserting infringed upon various additional federal constitutional rights to a fair and reliable trial. In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (for example, failure to declare a doubt concerning defendant's competence, failure to instruct sua sponte, or erroneous instruction affecting defendant's substantial rights) that required no trial court action by defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as erroneous for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

In the latter situation, of course, the rejection, on the merits, of a claim that the trial court erred regarding the issue actually presented to that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such instances, and we therefore provide none. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

trial court had no statutory duty to order severance on its own motion. He asserts, however, the specific claim that he is entitled to reversal of both murder convictions because joinder of the Clark and Benintende counts resulted in gross unfairness violating his right to due process of law under the federal Constitution. (See *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1083–1086.)

We have held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. (*People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442]; see also *People v. Grant* (2003) 113 Cal.App.4th 579, 594 [6 Cal.Rptr.3d 560] [finding gross unfairness even though trial court did not err in ruling on motion for severance].) Defendant asserts such review for gross unfairness is available even when no motion to sever ever was made. (See *People v. Simms* (1970) 10 Cal.App.3d 299, 308–309, 317 [89 Cal.Rptr. 1] [reviewing joint trial for gross unfairness, and finding none, even in the absence of a motion to sever defendant's trial from that of codefendant]; *People v. Chambers* (1964) 231 Cal.App.2d 23, 28, 34 [41 Cal.Rptr. 551] [reversing judgment in the absence of an objection to joinder of defendant's trial with that of codefendant, where joinder in combination with other errors resulted in gross unfairness and denial of due process]; cf. *People v. Burns* (1969) 270 Cal.App.2d 238, 251–253 [75 Cal.Rptr. 688] [reviewing for gross unfairness following an untimely motion to sever].) This court never has adopted the position urged by defendant, however.

■ We need not decide whether review for gross unfairness is available in the absence of a motion to sever or an objection to joinder, for even if such review is available, gross unfairness did not result in the present case. Ordinarily, "[w]hen the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice" to warrant severance.[8] (*People v. Marshall* (1997) 15 Cal.4th 1, 27 [61 Cal.Rptr.2d 84, 931 P.2d 262]; see also *People v. Sandoval* (1992) 4 Cal.4th 155, 172 [14 Cal.Rptr.2d 342, 841 P.2d 862].) "The initial step in any review of a motion to sever is to examine the issue of cross-admissibility of evidence. Since cross-admissibility would ordinarily dispel any possibility of prejudice [citations], we must inquire, had the severance motion been granted, would the evidence pertinent to one case have been admissible in the other under rules of evidence which limit the use

---

[8] Defendant was tried before the effective date of Proposition 115, adopted by the voters in 1990. Accordingly, Proposition 115's changes to the law affecting joinder and severance (see, e.g., Cal. Const., art. I, § 30, subd. (a); § 954.1) are inapplicable to this case. (See *People v. Arias* (1996) 13 Cal.4th 92, 126, fn. 7 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

of character evidence or prior similar acts to prove conduct [citations]." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 448 [204 Cal.Rptr. 700, 683 P.2d 699], fn. omitted.) Under section 1101 of the Evidence Code, "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion," but "evidence that a person committed a crime, civil wrong, or other act" is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subds. (a) & (b).) To be admissible, other-crimes evidence must be relevant to a material fact, and its admission must not be precluded by any rule or policy requiring the exclusion of relevant evidence. (See *People v. Catlin, supra,* 26 Cal.4th at p. 146.)

■ Here, the identity of Benintende's killer was a disputed material fact. Defendant testified he had no memory of that killing, and defense counsel did not concede defendant killed Benintende. Further, evidence of the Clark killing was relevant to the issue of identity. We have explained: " '[T]o be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses.' [Citation.] The similarity, considering the degree of similarity and the number of common marks, should amount to a signature." (*People v. Catlin, supra,* 26 Cal.4th at p. 111; see also *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757]; *Williams v. Superior Court, supra,* 36 Cal.3d at p. 450.) Here, the Clark and Benintende murders shared a number of common and distinctive marks: both women were prostitutes who last were seen alive on Union Avenue in Bakersfield; both suffered multiple gunshot wounds to the torso; both bodies were dumped in the Arvin-Edison Canal, in rural areas about seven miles from each other; and both were killed with the same gun, which belonged to defendant. Accordingly, the evidence of the two attacks was "probative of a common method or approach sufficient to support cross-admissibility" on the issue of identity. (*People v. Marshall, supra,* 15 Cal.4th at p. 28; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1316–1317 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

Furthermore, no rule or policy would have required exclusion of the evidence pertaining to the Clark homicide in a separate trial on the Benintende count. The evidence was highly probative, and its probative value was not outweighed by the danger of undue prejudice. (See Evid. Code, § 352.) The facts of the Clark killing, while sordid, were not unduly inflammatory. Accordingly, any inference that a joint trial prejudiced defendant's ability to defend against the Benintende charge is dispelled. (See *People v. Catlin, supra,* 26 Cal.4th at p. 112; *People v. Marshall, supra,* 15 Cal.4th at p. 28.)

Likewise, at a separate trial of the Clark matter, evidence of the Benintende killing would have been admissible to establish intent to kill. Evidence demonstrating that defendant had killed another prostitute and dumped her body in the same canal in which Clark's body was found would have refuted defendant's claim that he killed Clark while in a dissociative state, and supported an inference that defendant intended to kill Clark. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 402 [" '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . .' ", quoting 2 Wigmore, Evidence (Chadbourne rev. ed. 1979) § 302, p. 241]; see also *People v. Robbins* (1988) 45 Cal.3d 867, 879–880 [248 Cal.Rptr. 172, 755 P.2d 355].) Further, the evidence was not more prejudicial than probative, because it did not encourage the jury to prejudge defendant's case based upon extraneous or irrelevant considerations. (See *People v. Zapien* (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

Defendant asserts the joinder prejudiced him because, absent joinder, there likely would have been no capital charges. (See *People v. Catlin, supra,* 26 Cal.4th at p. 110 [prejudice may result from joinder where any one of the charges carries the death penalty or joinder of them turns the matter into a capital case].) If the cases had been severed, section 190.2, subdivision (a)(3) would not have applied, and under section 190.2, subdivision (a)(2), the possibility of a death sentence would have arisen only if the first case to be tried had been the Benintende case, and only if there had been a conviction in that case. (Cf. *Williams v. Superior Court, supra,* 36 Cal.3d at p. 454.) In view of the cross-admissibility of the evidence of the Clark homicide in the Benintende matter, however, conviction on the Benintende charges would have been likely even had the trials been severed. Accordingly, the joinder did not render the Clark offense a capital crime where otherwise it would not have been. We thus find that gross unfairness did not result from the joinder.

Defendant argues the trial court's failure to instruct the jury it could not consider evidence of each murder as character evidence to show defendant's propensity to commit the other murder contributed to the prejudice resulting from the joinder. He further asserts this instructional lapse constituted an independent violation of his rights to due process and a fair trial. (See *Panzavecchia v. Wainwright* (5th Cir. 1981) 658 F.2d 337, 341; see generally *Spencer v. Texas* (1967) 385 U.S. 554, 561–563 [17 L.Ed.2d 606, 87 S.Ct. 648].)

■ We have held a trial court has no "duty to furnish a limiting instruction on cross-admissible evidence in a trial of multiple crimes" on its

own motion. (*People v. Hawkins, supra,* 10 Cal.4th at p. 942; see also *People v. Sapp* (2003) 31 Cal.4th 240, 281 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Mendoza, supra,* 24 Cal.4th at p. 163.) In the context of limiting instructions concerning evidence of other crimes, we have recognized a narrow exception to the general rule not requiring sua sponte instruction: an objection may not be required in the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534]; see also *People v. Lang* (1980) 49 Cal.3d 991, 1020 [264 Cal.Rptr. 386, 782 P.2d 627]; *People v. Milner* (1988) 45 Cal.3d 227, 251–252 [246 Cal.Rptr. 713, 753 P.2d 669].) Defendant contends this exception applies to the rule not requiring sua sponte instruction on the limited admissibility of cross-admissible evidence in joint trials. Assuming the exception applies, defendant would not benefit from it. The Benintende evidence was not a "dominant part" of the evidence concerning the Clark count. Although the Clark evidence was a major part of the evidence related to the Benintende count, it was neither highly prejudicial nor minimally relevant. Defendant's instructional claim thus fails.

Defendant finally contends the joinder violated his Fifth Amendment right to testify on his own behalf in the Clark case while remaining silent in the Benintende case, his Sixth Amendment right to present a defense to the Benintende charges, and state and federal guarantees of equal protection of the laws (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7). Because defendant forfeited each of these claims by failing to raise them at trial (see *People v. Carpenter* (1997) 15 Cal.4th 312, 362 [63 Cal.Rptr.2d 1, 935 P.2d 708]), we decline to address their merits. We note, however, that we previously have rejected an identical equal protection claim. (*Ibid.*)

## C. *Defendant's absence from in-chambers hearings regarding juror excusals*

Defendant claims his absence from several unreported in-chambers conferences regarding juror hardship excusals violated his rights under the confrontation and due process clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as his rights under see Penal Code sections 977 and 1043 and article I, section 15 of the California Constitution.

At the commencement of the trial, the court agreed to provide the jurors with a hardship questionnaire prepared by defense counsel, who suggested some jurors could be eliminated by agreement of the parties based upon their answers to the questionnaire. In response to a question from the trial court

regarding section 190.9,[9] defense counsel explained his view that the statute's requirements would be satisfied if counsel and the court met informally off the record to discuss the questionnaires, but then put the results of their conference on the record. The prosecutor agreed. The court then asked defendant: "Mr. Rogers, is that procedure all right with you?" Defendant responded, "I don't have an opinion, sir."

The court distributed the questionnaires to the first panel of jurors. After an in-chambers unreported conference which defendant did not attend, 10 prospective jurors were excused by stipulation of counsel. The court repeated this process with each panel of jurors, eventually excusing 133 jurors based upon their responses to the hardship questionnaires and counsel's stipulation.[10]

Defendant now contends his absence from the in-chambers unreported conferences at which his counsel stipulated to the hardship excusals violated his state and federal rights to be present at all critical stages of his trial. The federal law governing a defendant's right to be present at trial is well established. " 'A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution . . . . [Citations.] A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.]' " (*People v. Lucero* (2000) 23 Cal.4th 692, 716–717 [97 Cal.Rptr.2d 871, 3 P.3d 248]; see *Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [96 L.Ed.2d 631, 107 S.Ct. 2658]; *Snyder v. Massachusetts* (1934) 291 U.S. 97, 105–106 [78 L.Ed. 674, 54 S.Ct. 330].) The standard under sections 977 and 1043 is similar. " '[T]he accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him . . . . [Citation.]' [Citation.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 742 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

We previously have rejected claims of error based upon a defendant's absence from discussions of juror hardship excusals. (E.g., *People v. Ervin,*

---

[9] At the time of trial, section 190.9 read: "In any case in which a death sentence may be imposed, all proceedings conducted after the effective date of this section in the justice, municipal, and superior courts, including proceedings in chambers, shall be conducted on the record with a court reporter present. [¶] The court shall assign a court reporter who uses computer-aided transcription equipment to report all proceedings under this section." (Stats. 1986, ch. 387, § 3, p. 1604.)

[10] The record does not reflect (1) a request by defendant or his counsel for defendant to be present at these in-chambers conferences, (2) an objection by either defendant or counsel to defendant's absence from the conferences, or (3) a waiver by defendant of his presence.

*supra,* 22 Cal.4th at pp. 72–74; *People v. Hardy* (1992) 2 Cal.4th 86, 178 [5 Cal.Rptr.2d 796, 825 P.2d 781].) We do so again here. As in *Ervin,* "[d]efendant's presence at counsels' jury screening discussions . . . would have served little purpose" (*People v. Ervin, supra,* 22 Cal.4th at p. 74), and he accordingly had no state statutory or federal constitutional right to attend those discussions. (Accord, *Cohen v. Senkowski* (2d Cir. 2002) 290 F.3d 485, 490 [no federal right to presence during discussion of hardship excuses].)

Defendant contends the cases cited above do not govern here, because the juror questionnaires—and hence the in-chambers discussions—were not limited to the question of hardship. Although the discussions related to hardship were not reported, the questionnaires concerning this subject have been made part of the record. Of the 133 prospective jurors of whom defendant complains, 20 gave answers that extended beyond hardship to areas of potential bias such as exposure to pretrial publicity, acquaintance with defendant or with Bakersfield law enforcement, or other matters.

Defendant contends that, to the extent the prospective jurors' answers on the questionnaires regarding hardship extended beyond that subject to other matters involving potential bias, we may infer the in-chambers discussions concerning those jurors also extended beyond the routine matter of hardship. We decline to engage in such speculation. Rather, because the parties stated on the record that they would examine the questionnaires in chambers to determine whether there were any "obvious hardship cases that can simply be excused by agreement of all parties," we presume that is what occurred.

Defendant asserts his absence from the in-chambers discussions of hardship excuses prevented him from consulting with counsel, in violation of his Sixth Amendment right to the effective assistance of counsel. (See *Geders v. United States* (1976) 425 U.S. 80, 88–91 [47 L.Ed.2d 592, 96 S.Ct. 1330] [trial court's order prohibiting counsel from speaking with defendant during a 17-hour overnight recess during trial violated his Sixth Amendment rights].) Defendant forfeited this claim by failing to object in the trial court. Were we to reach the merits, we would find no Sixth Amendment violation, because the trial court did not prohibit defendant and his counsel from discussing hardship excuses or any other aspect of the trial.

### D. *Asserted inadequacy of the record on appeal*

Defendant contends his rights under section 190.9 and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to a record adequate to permit meaningful appellate review were violated by the trial court's failure to order that the in-chambers discussions regarding juror

hardship be reported. Defendant contends an adequate record would demonstrate that the trial court abused its discretion and violated his constitutional rights by improperly granting hardship excuses.

We are not persuaded. It was defense counsel who initially suggested having off-the-record discussions of hardship questionnaires followed by on-the-record excusals. The court and the prosecutor agreed.[11] Accordingly, defendant waived any claim the trial court erred in failing to transcribe these proceedings (*People v. Gaston* (1978) 20 Cal.3d 476, 485 [143 Cal.Rptr. 205, 573 P.2d 423] [stipulation that no reporter's transcript of portion of proceedings was needed waived complaint of inadequate record on appeal]; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1333, fn. 70 [18 Cal.Rptr.2d 796, 850 P.2d 1]) and may not complain on appeal (*People v. Mickey* (1991) 54 Cal.3d 612, 667 [286 Cal.Rptr. 801, 818 P.2d 84] [failure to object in trial court forfeits claim of inadequate appellate record of juror excusals]).

■ In any event, state law entitles a defendant only to an appellate record "adequate to permit [him or her] to argue" the points raised in the appeal. (*People v. Howard* (1992) 1 Cal.4th 1132, 1165–1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review. (*Griffin v. Illinois* (1956) 351 U.S. 12, 16–20 [100 L.Ed. 891, 76 S.Ct. 585]; *Draper v. Washington* (1963) 372 U.S. 487, 495–496 [9 L.Ed.2d 899, 83 S.Ct. 774].) Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. (*Stephens v. Zant* (5th Cir. 1980) 631 F.2d 397, 403, rehg.

---

[11] The portion of the record in which defense counsel agreed to the in-chambers discussions is as follows:

"MR. LORENZ [Defense counsel]: Well, all right. I think that if we have time to examine the question[n]aires we may be able to eliminate some people by agreement.

"There should be some obvious hardship cases that can simply be excused by stipulation of all parties. That would save us time from questioning those people.

"THE COURT: All right, can we do that? Can we do that and not violate section 190.9 in your view?

"MR. LORENZ: My viewpoint of that section is we can still meet informally and then put the results of our conference on the record.

"THE COURT: Well, I am not sure about that.

"MR. LORENZ: We would simply have whatever conference we have on the record. I don't know that that matters.

"THE COURT: Any objection to that, Mrs. Ryals?

"MRS. RYALS [The prosecutor]: As long as it's on the record, I have no objection."

Defendant contends the record does not show defense counsel agreed to unreported discussions regarding juror hardship excusals. We disagree. Counsel suggested having off-the-record discussions followed by reported conferences memorializing the results, that is, noting which jurors were to be excused. That is precisely what occurred.

den. & opn. mod. (1981) 648 F.2d 446, cert. den. (1981) 454 U.S. 1035.) The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. (*People v. Scott* (1997) 15 Cal.4th 1188, 1203–1204 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Defendant fails to do so here.

Defendant contends a more complete record would permit him to show the trial court abused its discretion by improperly granting hardship excusals, resulting in more than half the prospective jurors being excused for hardship. Defendant asserts the unwarranted granting of hardship excusals systematically excluded wage earners in violation of his Sixth and Fourteenth Amendment and state constitutional rights to an impartial jury drawn from a fair cross-section of the community. (*Turner v. Murray* (1986) 476 U.S. 28 [90 L.Ed.2d 27, 106 S.Ct. 1683] [impartial jury requirement of Sixth Amend.]; *Duren v. Missouri* (1979) 439 U.S. 357, 363–370 [58 L.Ed.2d 579, 99 S.Ct. 664] [fair cross-section requirement of Sixth Amend.]; *People v. Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748] [Sixth Amend. & art. I, § 16 of the Cal. Const.]; see also *People v. White* (1954) 43 Cal.2d 740 [278 P.2d 9] [exclusion of wage earners].) He further contends allowing jurors too easily to opt out of serving on the present capital case resulted in a jury unconstitutionally skewed in favor of the death penalty, in violation of his Eighth Amendment right to a reliable penalty determination.

■ To establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, defendant would have to demonstrate: (1) the group allegedly excluded was a distinctive group in the community; (2) the representation of that group in the venire from which his jury was selected was not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation was due to systematic exclusion of that group in the jury selection process. (*Duren v. Missouri, supra,* 439 U.S. at p. 364; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1061 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318 [128 L.Ed.2d 293, 114 S.Ct. 1526].) He also would have to show he preserved the claim for appeal by objecting to the excusals on fair cross-section grounds below. (See *People v. Ervin, supra,* 22 Cal.4th at p. 73; *People v. Champion* (1995) 9 Cal.4th 879, 906–907 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People v. Mickey, supra,* 54 Cal.3d at pp. 663–665.) Defendant is unable to make either showing.

The questionnaires, along with the clerk's minutes of the proceedings and the on-the-record excusals of 133 of the prospective jurors whose hardship questionnaires were discussed in chambers, have been made part of the record on appeal. This record is adequate to establish that defense counsel

stipulated or agreed to all but one[12] of these 133 excusals. The record thus is adequate to show that defendant has waived any claim of error—including his federal constitutional claims—predicated on these 132 excusals. (See *People v. Ervin, supra,* 22 Cal.4th at p. 73; *People v. Champion, supra,* 9 Cal.4th at pp. 906–907; *People v. Mickey, supra,* 54 Cal.3d at pp. 663–665.)

As for the one prospective juror whom he did not stipulate to excuse—Carol K.—defendant fails to demonstrate how a reporter's transcript of the in-chambers discussions would aid him in establishing a fair cross-section violation. The exclusion of one prospective juror from the venire—even if erroneous—could not demonstrate a distinctive group was systematically or regularly excluded, resulting in a venire that did not fairly represent the community.

What we have said above holds true as well for defendant's argument that the lack of an adequate record has impaired his ability to present his Sixth-Amendment-impartial-jury and Eighth-Amendment-reliability claims. The premise of these claims is that the improper granting of hardship excusals resulted in a "volunteer" jury. Defendant, however, forfeited any claim of an inadequate record by agreeing to hold discussions of juror hardship off the record, and in any event the record is adequate to show defendant stipulated or agreed to every off-the-record excusal except that of Carol K. Finally, the excusal of that prospective juror—even if improper—would not establish that the jury venire was composed of volunteers in violation of defendant's federal constitutional rights.

---

[12] It is unclear whether defendant stipulated to the excusal of Prospective Juror Carol K. In her questionnaire Carol K. noted she worked for the district attorney's office, and the court confirmed on the record her employment in that office's family support division. Her questionnaire contains the notation "cause," although the panel sheet simply says "excuse." The stipulated settled statement concerning the conference at which she was excused does not mention her, although it mentions six other jurors who were excused by agreement of counsel and the court. Only the clerk's minutes state she was excused by agreement of the court and counsel. In light of this conflict in the record, we assume Carol K. was excused for cause. We further note that, because this trial occurred before our decision in *People v. Holt* (1997) 15 Cal.4th 619 [63 Cal.Rptr.2d 782, 937 P.2d 213], defendant did not forfeit any claim that her excusal for cause was erroneous, even assuming he failed to object in the trial court. (See *id.* at p. 658.)

Defendant also points to an ambiguity regarding the excusal of Prospective Juror Jeffrey N. That juror's questionnaire contains the notation "excused hardship," and the panel sheet contains an illegible notation. The reporter's transcript simply states he was excused. The court's minutes and the stipulated settled statement, however, state he was excused by agreement of counsel and the court. Because the questionnaire, the panel sheet, and the reporter's transcript do not actually conflict with the clerk's minutes and the settled statement, we assume the latter two documents are correct. Thus, defendant has forfeited any objection to the excusal of Jeffrey N.

Defendant contends the voir dire of additional jurors that occurred on the record, after the in-chambers hardship discussions, lends support to the inference that systematic exclusion occurred during the off-the-record discussions of hardship excuses. The record, however, again shows defendant stipulated or consented to 131 of the 137 hardship excusals that were granted during on-the-record voir dire. As for the remaining six excusals of which defendant complains, they do not establish a pattern of overly generously granting hardship excusals.[13] Rather, the trial court "used its practical experience and made pragmatic evaluations" (*People v. Mickey, supra,* 54 Cal.3d at p. 666) of the hardship the prospective jurors would experience should they be required to serve during a lengthy trial. The court did not excuse the six jurors simply because they did not wish to serve, but rather evaluated each potential juror's particular situation before excusing him or her. The on-the-record voir dire of these jurors lends no support to defendant's claim that a more complete record would enable him to demonstrate lack of a fair cross-section or other error.

Defendant further claims the trial court's failure to transcribe the in-chambers discussions in violation of section 190.9 is reversible per se, and urges us to reconsider our decision in *People v. Cummings, supra,* 4 Cal.4th at page 1333, footnote 70, rejecting such a claim. We decline to do so. Defendant next contends the trial court's failure to adhere to the requirements of section 190.9 arbitrarily denied him a state statutory entitlement in violation of his Fourteenth Amendment right to due process of law. (*Hicks v.*

---

[13] Prospective Juror Charles O. was a self-employed physician who stated on his questionnaire: "[W]hen I am out of the office there will not be adequate coverage to serve my patients and I will be financially unable to pay my employees and carry my overhead." The court excused Charles O. for financial hardship after he stated, "my employees are going to be hard to pay if I am out of the office for a period of time, much less me." Prospective Juror John B., "the only pharmacist employed by Kern Valley Hospital," stated his absence for a long period adversely could affect the patients he served. John B. said a substitute pharmacist could work only part time. The court excused him because the "health of the general public might be endangered by having the pharmacist gone from the hospital for that length of time." Prospective Juror Diane M., a health clerk at a hospital, would be paid for four weeks of jury duty, after which she would be required to take personal leave, which would present a financial hardship because she and her husband recently had purchased a new house. She also was pregnant. Prospective Juror Carl L., an oil field worker for a temporary agency, was not paid for days he did not work. He also recently had suffered a head injury and experienced frequent headaches. It appears the defense agreed to this excusal. Prospective Juror Edna H., a self-employed painting and decorating contractor, owned her own business and would miss work while serving on a jury. Prospective Juror Jennifer P., a merchandise buyer who supported herself, said her current employer would pay for jury service but was in the process of being acquired by another company, and she was uncertain what her future benefits would be. She said that from January through March, she would be very busy planning for the holiday season; her job had no "slack season," and she would be unable to concentrate on the trial because of her employment duties.

*Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].) As we observed above, this claim was forfeited by defendant's agreement to the procedure followed.

Defendant finally asserts that "if (as it appears) defense counsel improperly stipulated to systematically and intentionally exclude wage earners from jury service . . . he may have been acting as ineffective counsel," which prejudiced defendant by denying him the right to a representative jury under the Sixth Amendment, a fair trial under the Fifth and Fourteenth Amendments, and a reliable verdict under the Eighth Amendment. Defendant fails to show a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. (See *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 693–694, 104 S.Ct. 2052].) Here, nothing in the record suggests it is reasonably probable a jury that included more wage earners would have found defendant did not commit the crimes charged against him or would have voted to sentence him to life imprisonment without the possibility of parole rather than death. (See *Thomas v. Borg* (9th Cir. 1998) 159 F.3d 1147, 1152 [counsel's failure to raise and preserve a fair cross-section claim at trial did not prejudice defendant, because "the evidence, both testimonial and physical . . . was so overwhelming that it is hard to believe that any reasonable juror, black or white, would have voted to acquit him"]; see also *People v. Freeman* (1994) 8 Cal.4th 450, 487 [34 Cal.Rptr.2d 558, 882 P.2d 249] [defendant failed to show prejudice from counsel's failure to employ peremptory challenges to excuse prospective jurors, because "[n]othing in the record suggests . . . it is reasonably probable a different jury would have been more favorably disposed towards defendant"].)

E. *Asserted erroneous admission of evidence*

Over defendant's objection that the evidence was irrelevant and collateral, and impermissibly demonstrated propensity under section 1101 of the Evidence Code, the trial court admitted rebuttal evidence regarding defendant's brief termination from the sheriff's department in 1983 as a result of a complaint made by a prostitute. The prosecutor argued the evidence showed defendant had a motive to kill Clark—to keep her from reporting him, an act that could result in his termination—and thus rebutted defense testimony suggesting defendant killed Clark in an emotional state brought on by her taunts.

Lieutenant Paul Kent testified that in February 1983, while serving as a sergeant in the internal affairs division of the Kern County Sheriff's Department, he investigated a complaint against defendant made by a prostitute named Ellen Martinez. As a result of the investigation, defendant was terminated from the department, but he appealed and was reinstated.

Investigator Hodgson read into the record a portion of the transcript of the police interview of defendant conducted after his arrest for the Clark homicide. In response to a question concerning the Martinez incident, defendant stated: "There for awhile I was real pissed at her, but you know, I got to a point where I—I just—I never believed a whore . . . [¶] . . . That hearing just—it just changed my outlook, I guess." Defendant felt "done wrong by" Martinez. Clark did not remind him of Martinez, except that "she's a whore."

Defendant contends the evidence of his firing and reinstatement and of the comments he made about those events was inadmissible under subdivision (a) of section 1101 of the Evidence Code, because its sole purpose was to show his propensity to abuse prostitutes, and that in any event it should have been excluded as more prejudicial than probative under Evidence Code section 352. He asserts the admission of the evidence violated both state law and his right to due process under the Fourteenth Amendment to the United States Constitution, warranting reversal of his convictions for the murders of Clark and Benintende.

The trial court found the evidence admissible under section 1101 of the Evidence Code. We find no error in the trial court's ruling. Section 1101 declares that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) But "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b); see also *People v. Catlin, supra,* 26 Cal.4th at pp. 145–146.) We review for abuse of discretion a trial court's ruling under section 1101. (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

Here, the trial court admitted the evidence of defendant's firing and reinstatement and his comments about those events on the theory that it was relevant to defendant's motive in killing Clark. We agree. The evidence tended to show defendant had a reason to fear the consequences of any report Clark might make. It thus was relevant to motive, and therefore inferentially relevant to the disputed issues of intent, premeditation, and deliberation. (See *People v. Roldan, supra,* 35 Cal.4th at p. 707 ["evidence of motive makes the crime understandable and renders the inferences regarding intent more reasonable"]; see also *People v. Heishman* (1988) 45 Cal.3d 147, 167–171 [246 Cal.Rptr. 673, 753 P.2d 629].)

■ Nor did the trial court abuse its discretion in ruling that the evidence was admissible under Evidence Code section 352 because it was not more prejudicial than probative. The evidence was probative of motive, and had no prejudicial effect. At the guilt phase, the jury heard only that defendant had been briefly terminated, and then rehired, as a result of Martinez's complaint. The jury did not hear the details of the complaint until the penalty phase. Because defendant was reinstated, the jury heard no evidence suggesting that Martinez's charges were true. Defendant contends his own statements during police interrogation—for example, that after the Martinez ordeal he "never believed a whore" and that the incident "changed [his] outlook"—implied he was hostile to prostitutes and therefore the admission of these statements was highly prejudicial. We disagree. Evidence is prejudicial within the meaning of Evidence Code section 352 if it encourages the jury to prejudge defendant's case based upon extraneous or irrelevant considerations. (See *People v. Zapien, supra,* 4 Cal.4th at p. 958.) The evidence here did not do so. Rather, defendant's comments suggesting he believed all prostitutes were liars and were not to be trusted raised a permissible inference that he feared a report by Clark would be overblown.

Relying on *People v. Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126], defendant argues the evidence was inadmissible because his motive for killing Clark—to prevent her from turning him in—was obvious, and because the evidence was cumulative of much more direct evidence of motive: defendant's statements to the authorities that he killed Clark because he feared she would report him. In *Alcala,* the defendant was convicted of kidnapping and killing a young girl. We held evidence of prior *crimes* against young girls inadmissible to prove the defendant's motive. We noted: "Common sense indicates that one who commits a felony upon another wishes to avoid its detection. That may lead him to the calculated murder of his victim." (*People v. Alcala, supra,* 36 Cal.3d at p. 634.) We then rejected the prosecution's proffered theory that the prior-crimes evidence was admissible to establish a motive to eliminate the victim as a witness because those crimes might result in more severe punishment for the current offense. We concluded that if evidence of past offenses were admissible on that basis, "one's criminal past could always be introduced against him when he was accused of premeditated murder in the course of a subsequent offense. The accused's mere status as an ex-criminal would place him under an evidentiary disability not shared by first offenders. The prejudicial effect of the prior-crimes revelations would vastly outweigh their slight and speculative probative value." (*Id.* at p. 635.) We thus concluded that because "the issue of witness elimination was before the jury in any event[,] speculation that defendant was also worried about the implications of his past record is remote and cumulative." (*Ibid.*)

*Alcala* does not govern here. As the discussion above makes clear, in *Alcala* we were concerned with the implications of allowing admission of evidence of past *crimes* for the sole purpose of showing the defendant feared punishment as a repeat offender. We reasoned such a policy would be unfair to repeat offenders because the highly prejudicial nature of prior-crimes evidence would make it difficult for such offenders to receive a fair trial, whereas the probative value of the evidence was slight. Here, the evidence of defendant's firing and reinstatement did not suggest defendant was involved in any criminal activity; thus *Alcala*'s concerns about the highly prejudicial nature of prior-crimes evidence are not implicated. Nor was the evidence offered here for the impermissible and speculative purpose of suggesting defendant "was worried about the implications of his past criminal record." Rather, it was offered for the specific purpose of showing defendant feared what would happen to him if Clark were allowed to report him (even if, as he claimed in his statement to the authorities, he initially shot her accidentally). As such, the evidence was highly probative. Accordingly, the trial court did not abuse its discretion in admitting evidence of defendant's firing and reinstatement, as well as his taped comments.

 Defendant finally contends he was prejudiced because the trial court gave no instruction limiting, to proper purposes, the jury's use of the evidence of his firing and reinstatement and his taped comments.[14] A trial court generally is not obligated to provide such an instruction on its own motion. (*People v. Collie, supra,* 30 Cal.3d at p. 64; *People v. Ochoa, supra,* 19 Cal.4th at p. 411.) As noted above, we have recognized a narrow exception to this rule in the "occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Collie, supra,* 30 Cal.3d at p. 64; see also *People v. Milner, supra,* 45 Cal.3d at pp. 251–252.) This exception was inapplicable here. As explained, the evidence did not establish any past offense and was not prejudicial. The trial court was not required to instruct sua sponte on the limited admissibility of the evidence.

### F. *Asserted erroneous jury instructions—guilt phase*

Defendant contends the trial court failed sua sponte to instruct, or misinstructed, on several lesser included offenses and on other relevant principles, entitling him to reversal of his convictions for the Clark and Benintende murders. As explained below, we agree that the trial court erred by giving incomplete instructions on second degree murder, giving an incorrect instruction on the principle of concurrence of act and intent, and failing to instruct

---

[14] The prosecution requested that the trial court give CALJIC No. 2.50, but withdrew that request.

on the sufficiency of circumstantial evidence, but conclude these errors were harmless. We find defendant's additional claims of prejudicial instructional error at the guilt phase to be without merit.

### 1. *Adequacy of the record*

As a preliminary matter, defendant contends the trial court's failure to transcribe the in-chambers discussions of guilt phase jury instructions has deprived him of meaningful appellate review of his jury instruction claims. We disagree.

It appears that all discussions of guilt phase jury instructions took place at an unreported conference on March 14, 1988. We thus have no transcript of jury instruction discussions. A summary of the conference, however, was placed on the record. As relevant here, the trial court stated: (1) defense counsel had requested CALJIC No. 8.75 (jury may return partial verdict—homicide),[15] which the trial court had refused; (2) counsel agreed instructions on involuntary manslaughter need not be given; and (3) defense counsel "has no *Geiger* counts; that is to say, no lesser and includeds that fall within the purview of People versus Geiger at this time." When the trial court asked defense counsel whether the summary was correct, counsel stated: "True and accurate, your Honor. Well stated." In addition, the clerk's transcript contains copies of all the printed instructions requested but not given. The only instruction requested in writing by defendant and not given was CALJIC No. 8.75.

Defense counsel did not object to the trial court conducting discussions of proposed jury instructions off the record. When the trial court later went back on the record to summarize the proceedings that had occurred in chambers, defense counsel agreed the court's summary was "true and accurate." Counsel's failure to object to the procedure forfeits any claim that the record is inadequate. (*People v. Gaston, supra,* 20 Cal.3d at p. 485; see also *People v. Cummings, supra,* 4 Cal.4th at p. 1333, fn. 70; *People v. Mickey, supra,* 54 Cal.3d at p. 667.) The case of *People v. Young* (2005) 34 Cal.4th 1149 [24 Cal.Rptr.3d 112, 105 P.3d 487], upon which defendant relies, is not controlling. There, we presumed instructional errors were preserved for review because portions of the record of jury instruction discussions were missing, with no indication that the lapse was attributable to the defendant or his counsel. Here, by contrast, defendant's counsel did not object to having jury instruction discussions off the record. Moreover, as shown above, the record allows us to determine which jury instructions were requested and which

---

[15] Unless otherwise noted, all references to CALJIC are to the versions applicable at the time of defendant's trial in 1988, drawn from the fourth edition published in 1979, along with any pertinent revisions.

objections were made. It therefore is adequate to permit meaningful review of defendant's jury instruction claims.

### 2. *Failure to instruct on the definition of second degree murder with express malice*

#### a. *Error in omitting CALJIC No. 8.30*

We agree with defendant's contention that the trial court erred in failing to instruct the jury on the definition of second degree murder committed with express malice. Regarding the Clark charge, the court gave the jury the options of convicting defendant of first degree murder, second degree murder, or voluntary manslaughter. It instructed the jury on the elements of murder and on the principle that murder may be committed with either express or implied malice. (CALJIC Nos. 8.10 & 8.11.) It explained that first degree murder is a willful, deliberate, and premeditated killing. (CALJIC No. 8.20.) It also instructed that "[m]urder of the second degree is also the unlawful killing of a human being as a direct, causal result of an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life, or the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another, and who acts with conscious disregard for human life." (CALJIC No. 8.31.) It did not, however, instruct the jury that second degree murder also occurs when "there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." (CALJIC No. 8.30.) The prosecution initially requested this instruction, but withdrew that request. We agree the trial court erred by omitting an instruction that second degree murder includes an intentional but unpremeditated murder.

 "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [sua sponte duty]; *People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1] [duty upon request].) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*People v. Blair, supra,* 36 Cal.4th at p. 745; see also *People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Although defendant's jury was instructed on second degree murder with implied malice, the trial court had a duty to instruct on "all theories of a lesser

included offense which find substantial support in the evidence." *People v. Breverman, supra,* 19 Cal.4th at p. 162 [defendant was entitled to instruction on voluntary manslaughter committed as a result of heat of passion, in addition to instruction on voluntary manslaughter arising from an honest but unreasonable belief in the need for self-defense].)

Defendant's own testimony provided sufficient evidence from which the jury could conclude the killing was not premeditated. Defendant testified that when he killed Clark, he was not making any calculated judgment or weighing considerations for and against killing her; rather he felt only fear and pulled the trigger without thinking. Defendant's experts likewise testified defendant did not premeditate or deliberate in the killing of Clark. In Dr. Glaser's opinion, at the time of the killing defendant was overwhelmed with emotion stemming from his sexual dysfunction and "the volley of expletives that followed such dysfunction from Miss Clark," and "the actual shooting and killing was an impulsive heat of passion event" that was done without planning. Dr. Glaser believed that in this emotional state, defendant was incapable of premeditating and deliberating. Dr. Bird agreed the killing of Clark was an impulsive, emotional act of passion and fear, and opined there was no "thoughtful advance planning or anticipation of doing what he did," no reasoning or thinking, and no weighing of consequences. In Dr. Franz's opinion as well, defendant killed Clark in a very emotional, anxious state in which he did not have the "skills available" to premeditate and deliberate. The killing was "not a weighing or a balancing, but simply a defense mechanism to protect himself."

The jury could have concluded the emotional, impulsive nature of the killing precluded a finding of premeditation and deliberation but that defendant nevertheless intended to kill. Based on this evidence, the trial court should have given CALJIC No. 8.30. Indeed, the trial court did include references to both express malice and implied malice in the definition of murder. Although it explained that murder with implied malice is "also" second degree murder, and that implied malice does not require an intent to kill, it failed to explain that a murder committed with express malice could constitute second degree murder. The omission of CALJIC No. 8.30 created an obvious gap in the instructions that was not filled by any of the other instructions given.

### b. *Harmless error*

The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956)

46 Cal.2d 818, at pages 836–837 [299 P.2d 243].[16] Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. (*People v. Breverman, supra,* 19 Cal.4th at pp. 165–179; see also *People v. Seaton* (2001) 26 Cal.4th 598, 667 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

In the present case, it does not appear reasonably probable that the jury would have elected to convict defendant of second degree murder had it been instructed that an intentional but unpremeditated murder was a second degree murder. Defendant's jury was clearly instructed that first degree murder required not only an intentional killing, but one that is deliberate and premeditated. (CALJIC No. 8.20.) It also was told "[i]f you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but you have a reasonable doubt whether that murder was of the first or of the second degree, then you have to give the defendant the benefit of that doubt and return a verdict affixing the murder as of the second degree." (CALJIC No. 8.71.) Defendant's claim that the error was prejudicial is premised upon the supposition that the jury may have concluded the killing was intentional but not premeditated, yet convicted defendant of first degree murder despite the clear instruction that first degree murder required premeditation, because the instructions permitted no viable option for a conviction on a lesser offense. We disagree, for two reasons.

First, if the jury found that defendant shot Clark several times with the intent to kill her, we see no reasonable probability it would have believed that his conduct and state of mind did not fit the definition of second degree murder committed with implied malice, as it was explained to them. The jury was told, in the language of CALJIC No. 8.31, that second degree murder is a killing that results from "an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life," or an act "the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another, and who acts with conscious disregard for human life." Defendant's act of shooting Clark certainly could be characterized as one "involving a high degree of probability that it will result in death" or "the natural consequences of which are dangerous to life." Nothing in the instructions precluded the logical conclusion that if defendant intended to kill, he acted

---

[16] There is an exception to this rule when the failure to instruct on a lesser included offense rises to the level of a federal constitutional violation because it renders the capital verdict unreliable under the Eighth Amendment. (See *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382].) There also may be an exception when the error deprives the defendant of the federal due process right to present a complete defense. (See *California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 104 S.Ct. 2528].) We address these exceptions below.

with "wanton disregard for life" or knew "that his conduct endangered the life of another" and acted "with conscious disregard for human life." Thus, the instructions, reasonably understood, did not preclude a finding of second degree murder if the jury believed the killing was intentional. (Cf. *United States v. McCullah* (10th Cir. 1996) 76 F.3d 1087, 1111–1112 [holding two aggravating factors in the federal death penalty statute are duplicative because "[a]ny intentional conduct aimed at producing death is by definition conduct done with knowledge of grave risk of death"].)

We have stated that implied malice and intent to kill cannot coexist. (*People v. Visciotti* (1992) 2 Cal.4th 1, 58 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People v. Murtishaw* (1981) 29 Cal.3d 733, 764–765 [175 Cal.Rptr. 738, 631 P.2d 446].) This statement was made in the context of issues raised when instructions are given on implied malice and the offense—such as attempted murder or assault with the intent to kill—requires the specific intent to kill. (See also *People v. Lee* (1987) 43 Cal.3d 666, 673–674 [238 Cal.Rptr. 406, 738 P.2d 752].) In the present context, however, the issue is not whether instructions on implied malice might have caused the jury to convict defendant without the required finding of intent to kill, but instead whether instructions on implied malice would have prevented the jury from convicting defendant of second degree murder if it did find intent to kill. Nothing in the instructions told the jury that an intentional killing precluded a finding of implied malice. Rather, the jury was instructed that when implied malice is established, "it is not necessary to establish that a defendant intended that his act would result in a death of a human being." In other words, the jury would have understood the instruction to indicate that intent to kill was sufficient to establish implied malice, although such intent was not required.

Nothing in the arguments of the parties would have created the impression that the jury could not return a verdict of second degree murder if it found the killing was intentional but not premeditated. The prosecutor argued the murder of Benintende was second degree rather than first degree murder because "there's no question there was malice, that intent was there," but it was not clear whether defendant had "adequate time" to premeditate and deliberate. The prosecutor thus highlighted premeditation and deliberation as the critical factor distinguishing first and second degree murder, and indicated that malice without premeditation and deliberation would establish second degree murder. In addition, in discussing the second count involving Benintende, the prosecutor clearly stated second degree murder is "the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." She thus provided the jury with the definition of express malice second degree murder lacking in the instructions. Although the arguments of counsel cannot substitute for correct instructions from the court (*Carter v. Kentucky* (1981) 450 U.S. 288,

304 [67 L.Ed.2d 241, 101 S.Ct. 1112]), the arguments here support our conclusion that the jury was not misled (see *People v. Fudge* (1994) 7 Cal.4th 1075, 1111 [31 Cal.Rptr.2d 321, 875 P.2d 36]).

Second, even assuming the jury did not believe that an intentional killing could be a second degree murder, we find it unlikely the jury concluded the killing was intentional but not premeditated. In determining whether a failure to instruct on a lesser included offense was prejudicial, an appellate court may consider "whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman, supra,* 19 Cal.4th at p. 177; see also *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [94 Cal.Rptr.2d 17, 995 P.2d 152] [error harmless when evidence supporting lesser offense was weak].) Here, the evidence supporting the jury's verdict of guilt of first degree premeditated murder was relatively strong. In his confession, defendant said he killed Clark to prevent her from reporting him. Defendant said that after he shot Clark the second time, "she ran up the road and I realized I was—if she turned me in I was going to be arrested and go to jail, so I shot her four more times." Later, defendant said, "I knew she couldn't testify against me" if she was dead, and "that was the bottom line." Defendant had time to contemplate his course of action; he had to pull up his pants and then get out of his truck to pursue Clark after he shot her the first time. Defendant's account of the events was strong evidence establishing that he "weigh[ed] and consider[ed] the question of killing and the reasons for and against such a choice and, having in mind the consequences," decided to kill Clark. (CALJIC No. 8.20.) It also was strong evidence demonstrating that the killing was not impulsive or emotional, but rather a calculated decision made only after Clark threatened to make a report and defendant had adequate time to contemplate the consequences of allowing her to live and be able to report him.

Moreover, the physical evidence corroborated defendant's confession. For example, the pattern of gunshot wounds on Clark's body matched the description of the killings in defendant's confession. The pathologist testified Clark had one gunshot entry wound on the right side of the ribcage, the bullet passing through her body and lodging on the left side of her torso; one entry wound to her back; and four wounds more or less to the front of her torso, two of which had entered the body and two of which were graze wounds or abrasions. The jury could have inferred those wounds corresponded to the shots defendant confessed to having fired: one shot in the cab of the truck after Clark had been on her knees orally copulating him, one shot while Clark was running around in front of the truck's headlights (the only time she could have been shot in the back), and four shots while Clark was leaning against the embankment facing defendant.

By contrast, the evidence suggesting defendant did not premeditate and deliberate came largely from defendant and his experts and was comparatively weak. The experts based their opinions in large part on the account of the Clark killing described in defendant's sodium amytal interview conducted 10 months after the crime. Thus, in order to credit defendant's expert testimony on his state of mind, the jurors would have had to conclude that the account of the murders given by defendant in his trial testimony, which was based on his sodium amytal interview, was more accurate than the confession he made a few days after the crime occurred. We do not believe it is reasonably probable the jury so concluded. At trial, defendant stated he shot Clark once as she was walking toward him, pointing her finger; there was a "brief second or two" when Clark "backed up" into a canal bank, and defendant immediately shot her five more times. Defendant's testimony did not explain why Clark had a gunshot wound going from the right side of her torso to the left, as well as an entry wound in her back. If defendant's testimony was accurate, one would expect all of the wounds to have been to the front of her torso.

Moreover, the defense claimed that, until his memory was revived in the sodium amytal interview, defendant could not remember anything that happened after he pushed Clark out of the truck. The defense further claimed defendant, in a suicidal state and mindful of the legal requirements for various offenses, concocted the confession to ensure he would be convicted of capital murder. That theory did not explain how defendant was able to confess to details—such as seeing blood on Clark's right ribcage when she was in front of the headlights—that could have been known only to a person who consciously witnessed the shooting. Further, in his confession defendant lied about how he obtained the murder weapon, denied killing Benintende, and claimed he first shot Clark accidentally. Those statements undermine the claim that his confession was an attempt at "legal suicide."[17] In sum, given the relative strength of the evidence of premeditation and the relative weakness of the evidence to the contrary, we do not find it reasonably probable that had the jury been accurately instructed, it would have concluded defendant intended to kill Clark but did not premeditate or deliberate.

### c. *Federal constitutional claim*

Defendant contends that because the instruction on the express malice form of second degree murder embodied the defense theory of the case, the trial court's instructional failure deprived him of his right to present a complete

---

[17] Defendant argues that if his confession related a correct account of the events and he first shot Clark inside the truck, blood would have been found there, but none was. Defendant, however, had time to clean up any blood in the few days between the commission of that crime and his arrest.

defense guaranteed by the Fourteenth Amendment to the United States Constitution. Defendant relies on cases in which federal courts have held that a trial court's failure to give a requested instruction (whether on a lesser included offense, or on some other subject) embodying the defense theory of the case and around which the defendant had built his or her defense, violated the defendant's due process right to present a complete defense. (*Clark v. Brown* (9th Cir. 2006) 442 F.3d 708, 713–718 [instruction on felony-murder special circumstance]; *Conde v. Henry* (9th Cir. 2000) 198 F.3d 734, 739–740 [instruction on simple kidnapping as lesser included offense of kidnapping for robbery]; *United States v. Monger* (6th Cir. 1999) 185 F.3d 574, 576–577 [instruction on lesser included offense]; see also *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098–1099 [instruction on defense of entrapment].)

In these cases, unlike the present one, the instruction at issue was requested by the defense. The cases do not support the proposition that a trial court's failure to instruct on a lesser included offense sua sponte denies due process. Further, nothing in the record suggests the trial court would not have given the express malice second degree murder instruction had the defense asked for it. Nor can it be said that the omitted instruction "embodied the defense theory of the case." Rather, in closing argument the only lesser-included-offense verdict that defense counsel asked the jury to return was manslaughter. Although the defense presented evidence of lack of premeditation and deliberation and argued the prosecution's evidence did not support a finding of premeditation, defense counsel did not ask the jury to return a verdict of second degree murder.[18] Because defendant was allowed to present the defense he chose, followed by jury instructions he agreed to, he was not denied due process by being deprived of the opportunity to present a complete defense.

### 3. *Erroneous instruction regarding concurrence of act and specific intent*

We agree with defendant that the instruction given regarding the concurrence of act and specific intent was erroneous. The trial court gave a modified concurrence instruction, CALJIC No. 3.31, stating: "In each of the crimes charged in counts one and two and in the crime of voluntary manslaughter there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator, and unless such specific intent exists the crime to which it relates is not committed. [¶] The specific intent required is included in the definitions of the crimes charged. However, *the crime of murder requires the specific intent to unlawfully kill a*

---

[18] The closest defense counsel came to arguing for a verdict of second degree murder was to say, "if you feel the killing was done in a state of emotion, *we are not talking about first degree murder* and we are probably not even talking about murder."

*human being,* and the crime of voluntary manslaughter requires the specific intent to unlawfully kill a human being." As the Attorney General concedes, the concurrence instruction was erroneous because implied malice second degree murder, a form of murder, does not require the specific intent to kill.

Defendant argues that the erroneous concurrence instruction was prejudicial in several different ways. As explained below, we find the error to be harmless.

a. *Effect on the Clark count*

The error in the concurrence instruction did not directly affect the jury's first degree murder verdict on the Clark count. The concurrence instruction, as it related to first degree premeditated murder, was correct, for that crime does require a specific intent to kill. Moreover, the premeditated murder instruction itself informed the jury of the concurrence requirement for that offense. (CALJIC No. 8.20; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142–1143 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

Nevertheless, defendant argues, first, that the erroneous concurrence instruction was prejudicial in relation to the Clark count because it exacerbated the erroneous absence of an instruction on express malice second degree murder (discussed above). The concurrence instruction, which stated that all murder required an intentional killing, conflicted with the implied malice second degree murder instruction. CALJIC No. 8.31 stated: "When the killing is the direct result of [an act performed with implied malice], *it is not necessary to establish that the defendant intended that his act would result in the death of a human being.*" Defendant contends that in light of the conflict between these instructions on the mental state required for implied malice second degree murder, it is likely the jury ignored the implied malice second degree murder instructions entirely and that thus (contrary to our conclusion above) it did not view second degree implied malice murder as a viable option for an intentional, unpremeditated murder.

■■■ We disagree. When reviewing ambiguous instructions, we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights. (Cf. *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475].) Applying the same standard to the conflicting instructions at issue here, we conclude it is not reasonably likely the jury determined the implied malice second degree murder instructions meant nothing at all. The jury specifically was instructed that the Benintende count could result in a conviction no greater than second degree murder, and it convicted defendant of second degree murder on that count. The jury must have applied the implied malice second degree murder instructions to reach

that verdict. The jury's findings refute defendant's contention that the jury simply ignored the instructions.

Rather, we believe it is reasonably likely the jury, if it confronted the conflict between the two instructions, would have concluded that one instruction prevailed over the other. If the jury concluded the specific-intent-to-kill instruction prevailed over the implied malice instruction, defendant could not have been prejudiced. Presuming, as defendant's argument does, that the jury found defendant intended to kill Clark, the instruction fit the facts as the jury found them. Likewise, if the jury concluded the language in the implied malice instruction stating that intent to kill was not necessary prevailed over the concurrence instruction, defendant still was not prejudiced. As explained above, the implied malice instruction did not *preclude* a second degree murder conviction based on intent to kill.[19]

Second, defendant contends the conflicting instructions were prejudicial in relation to the Clark count because they could have caused the jurors to believe there was no difference between first degree premeditated murder and second degree murder, thus inviting them to "impose guilt [for the Clark murder] randomly rather than on the basis of a meaningful distinction between the crimes." (*United States v. Lesina* (9th Cir. 1987) 833 F.2d 156, 158–159.) We disagree. Even assuming the jurors would have believed implied malice second degree murder requires the specific intent to kill, the instructions on first degree premeditated murder required more: an intent to kill formed *after* premeditation and deliberation and a weighing of considerations for and against killing. Nothing in the implied malice murder instructions, even with an intent-to-kill requirement superimposed upon them, required anything close to that heightened mental state.[20]

---

[19] In the alternative, defendant asserts it was error to instruct at all on implied malice second degree murder in relation to the Clark killing, because no facts supported such a theory of murder. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) We disagree. Defendant shot Clark six times at close range. These facts support a finding of at least implied malice.

[20] Defendant contends the failure to instruct on express malice second degree murder coupled with the conflicting instructions on the mental state for implied malice murder left the jury without any viable alternative to a verdict of first degree premeditated murder for the Clark count, in violation of the Eighth Amendment to the United States Constitution as interpreted in *Beck v. Alabama, supra,* 447 U.S. 625. In *Beck,* the United States Supreme Court held a sentence of death may not be imposed, consistent with the Eighth and Fourteenth Amendments, when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense supported by the evidence. (*Beck v. Alabama, supra,* 447 U.S. at p. 627.) In *Schad v. Arizona* (1991) 501 U.S. 624, at pages 645–648 [115 L.Ed.2d 555, 111 S.Ct. 2491], the high court clarified the *Beck* rule, holding the Eighth Amendment is satisfied if a

### b. *Effect on the Benintende count*

As to the Benintende count, defendant claims that because the concurrence instruction referred only to the mental state of intent to kill, the court failed to instruct the jury that the mental state required for implied malice murder—conscious disregard for life—must exist at the same time as the acts causing death. This asserted error was one of state law, subject to the *Watson* standard of harmless error. (See *People v. Alvarez* (1994) 14 Cal.4th 155, 219–220 [58 Cal.Rptr.2d 385, 926 P.2d 365] [applying *Watson* "reasonable probability" standard to error in failing to instruct on concurrence requirement for murder].) Any error was harmless. The instructions on implied malice and second degree murder on an implied malice theory "substantially covered the concurrence" of act and mental state required for implied malice murder. (*People v. Alvarez, supra,* 14 Cal.4th at p. 220.) The instruction defining malice aforethought told the jury that "malice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and *with a wanton disregard for human life*, or when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and *who acts with conscious disregard for life*." The implied malice murder instruction contained similar wording. The italicized language in these instructions adequately informed the jury of the concurrence requirement.[21] (See *People v. Cleaves* (1991) 229 Cal.App.3d 367, 381 [280 Cal.Rptr. 146]; see also *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1142–1143.)

Finally, the conflict between the implied malice instruction and the concurrence instruction was harmless as to the Benintende count. At worst, the erroneous concurrence instruction might have led the jury to believe it had to find a mental state more culpable than that required for second degree murder—that is, specific intent to kill rather than mere implied malice. Because the instruction at most could have been understood as imposing a burden on the prosecution more onerous than the law required, defendant could not have been prejudiced under any standard.

---

capital jury is presented with any one applicable lesser included noncapital offense; the jury need not be instructed on every applicable lesser included offense. (See *People v. Breverman, supra,* 19 Cal.4th at p. 167.)

Here, we have concluded the jury properly was instructed on implied malice second degree murder, and defendant concedes it properly was instructed on voluntary manslaughter under a heat-of-passion theory. Accordingly, there was at least one applicable lesser included offense presented to the jury as to the Clark count. No *Beck* error occurred.

[21] Such error does not require reversal without an inquiry into prejudice. *People v. Cummings, supra,* 4 Cal.4th at pages 1311–1315, upon which defendant relies, involved a complete failure to instruct on four of the five elements of robbery. No similar instructional failure occurred here.

### 4. *Notes from the jury*

Defendant points to the jurors' questions during deliberations as support for his argument that he was prejudiced by the asserted instructional errors discussed above. He also cites the court's responses to those questions as additional error requiring reversal. We reject both contentions.

During deliberations, the jury sent the trial court a note seeking, in relevant part, "definitions of the degrees of murder." In response, with the agreement of both defense counsel and the prosecutor, the court gave the jury written copies of all of the instructions it had given orally—those related solely to murder, as well as those related to all other guilt phase issues.

Defendant contends that the jurors' question demonstrates they were confused about the meaning of the degrees of murder, supporting his argument that errors in the concurrence instruction and the second degree murder instruction were prejudicial. We disagree. That the jurors requested "definitions of the degrees of murder" does not demonstrate they were confused; rather, given the length and complexity of the instructions, the jurors simply may have failed to recall specifically and completely all the instructions that had been read to them. The trial court responded by giving the jurors the instructions in written form, which apparently satisfied them.[22]

Defendant asserts the trial court's response to the jury's question also violated his rights under section 1138.[23] Defendant contends that, rather than merely furnishing the jury with written copies of the instructions it already had given orally, the trial court was obligated to provide the instruction on express malice second degree murder it had failed to provide originally. This argument is essentially a restatement of the argument previously discussed, that the trial court erred in omitting the instruction on the first occasion. For the same reasons we noted in finding the original instructional error to be harmless, the repetition of that error in the written instructions also was harmless.

---

[22] The trial court read the definition of express malice in CALJIC No. 8.11 to the jury, but crossed it out on the written version given to the jury. When the trial court gave the jury the written instructions, it told them: "[P]lease disregard any deleted part of the instructions and not speculate as to what was or is the reason for its deletion." The crossing out of the definition of express malice from the written instructions was not prejudicial error, in light of our conclusion, above, that the instructions on implied malice second degree murder (CALJIC No. 8.31) permitted the jurors to find defendant guilty of second degree murder even if they concluded he intended to kill Clark.

[23] Section 1138 states: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

To the extent defendant contends the trial court, in response to the jury's inquiry regarding the "degrees of murder," should have provided additional instructions on express malice second degree murder other than the one discussed above or should have elaborated on the standard instruction, his counsel's acquiescence in the trial court's response forfeits the claim of error on appeal. (*People v. Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811]; *People v. Medina* (1990) 51 Cal.3d 870, 902 [274 Cal.Rptr. 849, 799 P.2d 1282].) In any event, defendant does not identify any respect in which the standard instruction could have been improved upon. His claim of error therefore must be rejected.[24]

The clerk's transcript contains another jury note inquiring, "may we have the legal definitions of the crimes being charged." Defendant asserts the trial court violated section 1138 by not responding to this second note. Unlike the other jury notes in the clerk's transcript, the second note is not marked with the date and time, and there is no indication that counsel or the trial court ever saw or discussed it. There is no evidence in the record indicating that the note ever was submitted to the trial court, or if it was, when that occurred. For all we can determine, the note may have been a rejected first draft of the note considered by the court. We may not predicate error or prejudice on the bare existence of the second note.

Defendant contends his trial counsel was not informed of the existence of the second note during trial, and defendant was unaware of it until late 1998 when he read the brief filed by respondent in this court.[25] He argues that the trial court's failure to inform defense counsel of the note violated section 1138 and denied him the assistance of counsel, in violation of the Sixth Amendment to the United States Constitution. (See, e.g., *People v. Horton* (1995) 11 Cal.4th 1068, 1136–1137 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 69 [14 Cal.Rptr.2d 133, 841 P.2d 118].) On this record, we are unable to verify defendant's assertion that trial counsel was not informed of the existence of the second note. Accordingly, because error has not been affirmatively shown (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]), defendant's claims under section 1138 and the Sixth Amendment must fail.

### 5. *Failure to instruct on provocation*

In a related contention, defendant asserts the trial court erred in failing to instruct on its own motion that provocation inadequate to reduce a killing

---

[24] Our rejection here of defendant's claims based upon section 1138 extends, for the same reasons, to any claim by him that the trial court, in response to the jury's question, failed to instruct or reinstruct adequately on other aspects of murder.

[25] Defendant's counsel did not receive a copy of the supplemental clerk's transcript containing the note until June of 1999.

from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder. (See CALJIC No. 8.73; see also *People v. Valentine* (1946) 28 Cal.2d 121, 132 [169 P.2d 1].) CALJIC No. 8.73 explains this concept.[26] The Attorney General contends that CALJIC No. 8.73 is a "pinpoint instruction" relating particular evidence to an element of the offense, and therefore need not be given on the court's own motion. We agree.

We have recently stated, albeit in dicta, that CALJIC No. 8.73 is a pinpoint instruction. (*People v. Ward* (2005) 36 Cal.4th 186, 214–215 [30 Cal.Rptr.3d 464, 114 P.3d 717] [where CALJIC No. 8.73 was requested and trial court agreed to give it but for some reason failed to do so, there was no error because no evidence supported the giving of the requested instruction]; *People v. Mayfield* (1997) 14 Cal.4th 668, 778 [60 Cal.Rptr.2d 1, 928 P.2d 485] [on appeal, defendant could not complain that CALJIC No. 8.73, which was given, was ambiguous or otherwise inadequate when he failed to request any modifications at trial].) This conclusion is supported by *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588], a murder case in which we held the trial court was not required to instruct on its own motion that the jury should consider the defendant's voluntary intoxication in determining whether defendant premeditated and deliberated. (*Id.* at pp. 1117–1120.) We noted that because the defense of diminished capacity had been abolished, "[i]ntoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state. Thus it is now more like . . . 'pinpoint' instructions . . . to which a defendant is entitled upon request. Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case . . . . They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille, supra,* 54 Cal.3d at p. 1119; see also *id.* at p. 1120 [instruction relating evidence of intoxication to premeditation and deliberation does not involve a general principle of law as that term is used in cases imposing a sua sponte duty to instruct].)

Similarly, under the principles expressed in CALJIC No. 8.73, provocation is relevant only to the extent it "bears on the question" whether defendant premeditated and deliberated. (*People v. Saille, supra,* 54 Cal.3d at p. 1119.) Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a "pinpoint instruction" as

---

[26] CALJIC No. 8.73 provides: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

that term was defined in *People v. Saille, supra,* 54 Cal.3d at pages 1119–1120, and need not be given on the court's own motion. (Accord, *People v. Middleton* (1997) 52 Cal.App.4th 19, 30–33 [60 Cal.Rptr.2d 366] [CALJIC No. 8.73 is a pinpoint instruction that need not be given on the court's own motion]; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732–1734 [34 Cal.Rptr.2d 723] [same]; Com. to CALJIC No. 8.73 (6th ed. 1998) (July 2002 rev.) [no sua sponte duty to instruct]; Judicial Council of Cal., Crim. Jury Instns. (2005) Bench Notes to CALCRIM No. 522 [no sua sponte duty to instruct with CALCRIM analogue to CALJIC No. 8.73].)

Defendant relies on *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673]. There, we stated in dictum that "a sua sponte instruction on provocation and second degree murder must be given 'where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately' to carry it out." (*Id.* at pp. 42–43, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311]; see also *People v. Perez* (1992) 2 Cal.4th 1117, 1129 [9 Cal.Rptr.2d 577, 831 P.2d 1159] [no sua sponte duty to instruct pursuant to CALJIC No. 8.73 where no evidence supported the instruction]; but see *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [120 Cal.Rptr.2d 432, 47 P.3d 225] [noting inconsistency between *Johnson* and *Perez* on the one hand, and *Mayfield* on the other].)

*Johnson* cited *People v. Wickersham, supra,* 32 Cal.3d 307, for the proposition that the court has a sua sponte duty to instruct on the principles contained in CALJIC No. 8.73. *Wickersham,* however, held only that an instruction on second degree murder must be given when the evidence supports the theory that the defendant killed in response to provocation and thus without premeditation and deliberation. *Wickersham* did not state that the trial court must explain the principles spelled out in CALJIC No. 8.73. Accordingly, *Johnson*'s reliance on *Wickersham* for the proposition that CALJIC No. 8.73 must be given on the court's own motion was erroneous. Indeed, in *Johnson* the trial court had instructed on second degree murder; thus, *Wickersham* was inapposite.

Nor is our conclusion inconsistent with *People v. Valentine,* upon which CALJIC No. 8.73 is based. There, the defendant killed the victim during an argument after the victim accused the defendant of trespassing and, according to the defense, swore at the defendant and shoved him. The defendant was convicted of first degree murder. We reversed based on a host of instructional errors. (*People v. Valentine, supra,* 28 Cal.2d at pp. 137–144.) We also suggested the instructions on heat-of-passion voluntary manslaughter were misleading because the jury might have understood them as implying that provocation that was inadequate to reduce the murder to manslaughter was

irrelevant to any issue. But in that case, the court also had instructed the jury erroneously that: (a) if the defendant possessed the specific intent to kill, the killing was first degree murder (thus blurring the distinction between first and second degree murder); and (b) the defendant bore the burden of raising a reasonable doubt as to the degree of the murder. (*People v. Valentine, supra*, 28 Cal.2d at pp. 130–134.)

*Valentine* does not stand for the general proposition that the standard heat-of-passion voluntary manslaughter instructions are always misleading in a homicide case where the jury is instructed on premeditated murder and there is evidence of provocation, or that such manslaughter instructions always must be accompanied by instructions on the principle of inadequate provocation set out in CALJIC No. 8.73. In the absence of instructional errors such as were present in *Valentine*, the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed. For the foregoing reasons, we hold that CALJIC No. 8.73 is a pinpoint instruction that need not be given on the court's own motion.

### 6. *Failure to instruct on the relationship of mental disease or defect to premeditation and deliberation*

The jury was instructed pursuant to a modified version of former CALJIC No. 3.36 (now CALJIC No. 3.32), as follows: "Evidence has been received regarding a mental disease or mental defect or mental disorder of the defendant at the time of the offenses charged in counts one and two and in the lesser included offense of voluntary manslaughter. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crimes charged in the information and the crime of voluntary manslaughter." Defendant contends the trial court erred by failing to identify the specific mental state or states—namely premeditation and deliberation—to which defendant's mental health evidence was relevant. Defendant points out that the use note accompanying the standard instruction directs the trial judge to specify the mental state or intent required in each specific count. (Use Note to CALJIC No. 3.36 (1987 rev.) (4th ed. 1979).) He contends the trial court exacerbated the error by failing to give CALJIC No. 3.31.5, the instruction on concurrence of act and mental state, which would have specified that the necessary mental state required for first degree murder was premeditation and deliberation. He argues the instructions as a whole would have led the jury to believe it could

not consider the defense mental health evidence in determining whether the killing of Clark was premeditated and deliberate.[27]

We disagree.[28] We previously have rejected claims that a trial court erroneously failed to identify premeditation and deliberation as mental states to which evidence of mental disease or defect was relevant, in cases where the trial court either explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1247–1249 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Jones* (1991) 53 Cal.3d 1115, 1145 [282 Cal.Rptr. 465, 811 P.2d 757]) or instructed that " '[t]he mental state required is included in the definition of the crime charged' " (*People v. Smithey* (1999) 20 Cal.4th 936, 988 [86 Cal.Rptr.2d 243, 978 P.2d 1171]). We also have rejected a similar claim regarding the instruction relating voluntary intoxication to mental state. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014, fn. 2 [68 Cal.Rptr.2d 648, 945 P.2d 1197] [pinpoint instruction relating voluntary intoxication to premeditation and deliberation not required where jury was fully instructed on first degree premeditated murder and also instructed that the requisite mental states would be defined " 'elsewhere in these instructions' "].) In the foregoing cases, in light of full instructions defining first degree murder including an explanation of premeditation and deliberation, we concluded "a reasonable jury would have understood that the requisite mental states (as set forth in the definitions of the crimes) were the same 'mental states' that could be considered in connection with the evidence of defendant's mental disease, defect, or disorder." (*People v. Smithey, supra,* 20 Cal.4th at p. 989.)

Although, in contrast to the cases cited above, the jury neither was informed that premeditation and deliberation were mental states, nor told that the mental state required for each crime was included in the definition of that crime, the instructions as a whole nonetheless adequately informed the jury it could consider defendant's evidence of mental disease or defect in deciding whether he premeditated and deliberated the killing of Clark. As we explained in *People v. Castillo, supra,* 16 Cal.4th at page 1017: "Premeditation and deliberation are clearly mental states; no reasonable juror would assume otherwise. Moreover, they refer to the quality of the intent to kill." Similarly here, the instruction on first degree murder fully explained the concepts of premeditation and deliberation. The jury would have understood that they are

---

[27] Defendant further asserts the failure to give CALJIC No. 3.31.5 was itself error, but he does not contend the error standing alone warrants reversal.

[28] We may review this contention under section 1259 even in the absence of an objection. That statute states in pertinent part: "Upon an appeal taken by the defendant, the appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (*Ibid.*)

mental states. "By relating [mental disease or defect] to mental state, the [challenged] instruction necessarily directed the jury's attention to evidence of [mental disease or defect] as it related to premeditation and deliberation." (*Ibid.*)

Moreover, defense counsel's argument reinforced the notion inherent in the instructions that premeditation and deliberation are mental states. Several times in argument, defendant's counsel equated the concept of mental state with premeditation and deliberation. Counsel argued the prosecution had to prove mental state beyond a reasonable doubt, and then asked the jury to consider whether the prosecution "had proven a state of premeditation and deliberation beyond a reasonable doubt." Counsel also asked rhetorically whether defendant killed Clark "with the high level of mental state of weighing considerations for and against?" Under all the circumstances, no reasonable juror would have assumed premeditation and deliberation were not "mental states" as that term was used in the instruction relating defendant's evidence of mental disease or defect to the mental state necessary for the charged crimes. (Cf. *People v. Castillo, supra,* 16 Cal.4th at p. 1017.)

### 7. *Assertedly defective voluntary manslaughter instruction*

Defendant asserts the trial court erred prejudicially in failing to instruct on its own motion on the lesser included offense of voluntary manslaughter under an imperfect-self-defense theory. (See *People v. Flannel, supra,* 25 Cal.3d at p. 674.) He contends the error deprived him of rights guaranteed under the United States Constitution, warranting reversal of his conviction for the Clark murder.

The trial court instructed the jury pursuant to a modified version of CALJIC No. 8.40 that voluntary manslaughter is "the unlawful killing of a human being without malice aforethought when there is an intent to kill," and that "there is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion." In the written version of CALJIC No. 8.40 given to the jury, the trial court crossed out the following language explaining imperfect self-defense: "there is no malice aforethought if the killing occurred . . . in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." The trial court gave a similarly modified version of CALJIC No. 8.50 distinguishing murder and manslaughter. It did not give CALJIC No. 5.17, which further explains the imperfect-self-defense theory of voluntary manslaughter.[29]

---

[29] At the time of trial, CALJIC No. 5.17 read in pertinent part: "A person who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and

In *People v. Flannel* we thus explained the doctrine of imperfect self-defense: "An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*People v. Flannel, supra,* 25 Cal.3d at p. 674, italics omitted; see also *In re Christian S.* (1994) 7 Cal.4th 768, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574].) We since have reaffirmed this doctrine, but have cautioned that it is "narrow" and will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with.*" ' " (*In re Christian S., supra,* 7 Cal.4th at p. 783.) We have explained further that imperfect self-defense is not a true defense; it is rather "a shorthand description" of one form of the crime of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 200 [47 Cal.Rptr.2d 569, 906 P.2d 531].) Thus, a trial court's duty to instruct on this theory arises "whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (*People v. Barton, supra,* 12 Cal.4th at p. 201.)

Here, there was no substantial evidence from which the jury could have concluded defendant killed Clark due to an honest but unreasonable belief that he needed to defend himself from an imminent threat to his life or to his bodily integrity. Neither defendant nor his experts testified defendant actually believed he had to kill Clark to defend himself from such an imminent threat. In support of the instruction, defendant points to his own testimony that when Clark was walking toward him with her finger pointed at him, he felt "threatened" and "afraid" and shot her out of a need for "protection." He also points to his mental health experts' testimony that the killing of Clark was an act of "survival." For example, Dr. Franz testified the events leading up to the shooting, including defendant's failure to perform sexually and Clark's taunts and physical threats, caused defendant to react like a frightened, abused child and to fire the gun as "a defense mechanism to protect himself." Dr. Bird also explained defendant associated Clark with his abusive stepmother and shot her "out of fear of not surviving himself."

Contrary to defendant's contention, we do not read this testimony as supporting an inference that defendant believed he needed to defend himself from death or great bodily injury. Rather, Dr. Franz's and Dr. Bird's testimony is more susceptible of the interpretation that defendant feared for his emotional survival rather than that he feared for his physical survival. For example, Dr. Franz stated defendant "lost a sense of his body and began to

cannot be found guilty of murder. This would be so even though a reasonable man in the same situation and knowing the same facts would not have had the same belief." (CALJIC No. 5.17 (Jan. 1987 rev.) (4th ed. 1979).)

try to protect his essence, his soul, that last thread that was trying to be moral and solid and sane." Further, defendant himself testified only that he felt fear and a need for protection. He did not state what he feared and certainly never testified he feared his life was in danger or that he would suffer great bodily injury.

The only testimony suggesting that defendant actually feared for his life came from Dr. Bird, who acknowledged it is "ridiculous to fear for your own life when somebody is pointing a finger at you." That isolated comment did not constitute substantial evidence—that is, evidence from which a jury composed of reasonable persons could find (*People v. Breverman, supra,* 19 Cal.4th at p. 162)—that defendant (a deputy sheriff armed with a revolver) feared great bodily injury or death from an unarmed 15-year-old girl. For these reasons, the trial court did not err in failing to instruct on the doctrine of imperfect self-defense.

### 8. *Failure to instruct on involuntary manslaughter*

Defendant asserts the trial court erred in failing to instruct on its own motion on the lesser included offense of involuntary manslaughter in relation to count one, the Clark count. Involuntary manslaughter is "the unlawful killing of a human being without malice aforethought and without an intent to kill." (CALJIC No. 8.45 (Jan. 1987 rev.) (4th ed. 1979).) A verdict of involuntary manslaughter is warranted where the defendant demonstrates "that because of his mental illness . . . he did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought)." (*People v. Saille, supra,* 54 Cal.3d at p. 1117.) An instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant did not actually form the intent to kill. (*People v. Webber* (1991) 228 Cal.App.3d 1146, 1162 [279 Cal.Rptr. 437]; see *People v. Ray* (1975) 14 Cal.3d 20, 28–29 [120 Cal.Rptr. 377, 533 P.2d 1017].)

Assuming the trial court erred in failing to instruct on involuntary manslaughter, any error was harmless. In addition to being fully instructed on first degree premeditated murder, the jury also was instructed on the lesser included offenses of implied malice second degree murder and heat-of-passion voluntary manslaughter, both of which require higher degrees of culpability than does the offense of involuntary manslaughter. The jury rejected the lesser options and found defendant guilty of first degree premeditated murder. Under the circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option.

### 9. *Failure to instruct on the sufficiency of circumstantial evidence*

Defendant contends the trial court failed to instruct on the sufficiency of circumstantial evidence pursuant to CALJIC No. 2.01, an omission that prejudiced him in relation to the Benintende count.[30] The trial court did give CALJIC No. 2.02 on the sufficiency of circumstantial evidence of specific intent or mental state. An instruction on the principles contained in CALJIC No. 2.01 "must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt. (*People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].)" (*People v. Marquez* (1992) 1 Cal.4th 553, 577 [3 Cal.Rptr.2d 710, 822 P.2d 418].) "The instruction should not be given 'when the problem of inferring guilt from a pattern of incriminating circumstances is not present.' " (*People v. Wiley, supra,* 18 Cal.3d at p. 174.)

Here, the prosecution's case regarding the identity of Benintende's killer rested principally on two items of circumstantial evidence—defendant's possession of the murder weapon and his admitted killing of Clark (like Benintende, a prostitute) a year later. There was no direct evidence linking defendant to Benintende; no witnesses saw defendant with her and defendant did not confess to killing her. Accordingly, the trial court erred in failing to instruct pursuant to CALJIC No. 2.01. The giving of CALJIC No. 2.02 did not cure the error, for that instruction by its terms applied only to circumstantial evidence of specific intent or mental state.[31] The jury first had to determine the identity of Benintende's killer, and CALJIC No. 2.02 did not speak to that issue.

---

[30] At the time of trial, CALJIC No. 2.01 provided: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. [¶] If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

[31] CALJIC No. 2.02, as given to the jury, provided: "The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offenses charged in counts one and two, or the crime of voluntary manslaughter, unless the proved circumstances are not only consistent with the theory that he had the required specific intent or mental state, but cannot be

The error, however, was harmless. Because CALJIC No. 2.02 was given, the failure to give CALJIC No. 2.01 could have affected only the issue of identity. On that issue, the evidence supporting the jury's determination that defendant killed Benintende, while circumstantial, was strong. Both women were killed with the same gun. Defendant had obtained that weapon in 1982, and there was no evidence any other person had access to it. Further, defendant's admission to the Clark killing provided strong circumstantial evidence he also killed Benintende. Both women were prostitutes who frequented Union Avenue; defendant admitted to an affinity for prostitutes. Both women were shot multiple times, and their bodies were recovered from the same canal (although several miles apart). The similarities between the two crimes pointed strongly toward defendant as Benintende's killer. Indeed, the circumstantial evidence was not "susceptible of [a] reasonable interpretation[] . . . which points to the defendant's . . . innocence." (CALJIC No. 2.01.)

Moreover, the direct evidence pointing toward innocence was weak. Defendant presented no evidence related to the Benintende killing. The prosecution presented evidence that in his confession defendant first denied, then said he could not remember, killing Benintende. On the stand, defendant testified, "I have no memory of the Benintende homicide." Defendant's testimony that he could not remember was not inconsistent with the evidence of guilt. The only direct evidence that defendant did not kill Benintende was his denial in his confession. Defendant did not repeat that denial in his testimony before the jury. Under the circumstances, there is no reasonable probability (*People v. Watson, supra,* 46 Cal.2d at p. 836) that had the jury been given the circumstantial evidence instruction, it would have found defendant did not kill Benintende.

Defendant contends the error violated several of his federal constitutional rights. Insofar as the federal Constitution itself does not require courts to instruct on the evaluation of circumstantial evidence where, as here, the jury properly was instructed on reasonable doubt (*Holland v. United States* (1954) 348 U.S. 121, 140 [99 L.Ed. 150, 75 S.Ct. 127]; see also *Victor v. Nebraska* (1991) 511 U.S. 1, 7–17 [127 L.Ed.2d 583, 114 S.Ct. 1239] [approving California's pattern instruction on reasonable doubt]), defendant's claim necessarily rests on the asserted arbitrary denial of a state-created liberty

reconciled with any other rational conclusion. [¶] Also, if the evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state, and the other to the absence of the specific intent or mental state, it is your duty to adopt that interpretation which points to the absence of the specific intent or the mental state. [¶] If, on the other hand, one interpretation of the evidence as to such specific intent or mental state appears to you to be reasonable, and the other interpretation to be unreasonable, then it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

interest. (See *Hicks v. Oklahoma, supra,* 447 U.S. 343.) We doubt the common law right to a circumstantial evidence instruction rises to the level of a liberty interest protected by the due process clause. (Cf. *People v. Breverman, supra,* 19 Cal.4th at pp. 170–172 [right under state law to lesser-included-offense instruction does not create liberty interest under *Hicks*].) In any event, any federal constitutional error would be harmless beyond a reasonable doubt for the reasons expressed above.

### 10. *Failure to instruct on unconsciousness*

■ Defendant contends the trial court erred in failing to instruct on its own motion on the defense of unconsciousness under CALJIC No. 4.30. Among those persons deemed incapable of committing a crime are individuals who "committed the act charged without being conscious thereof." (§ 26, class four.) Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime. (*People v. Babbitt* (1988) 45 Cal.3d 660, 693 [248 Cal.Rptr. 69, 755 P.2d 253]; *People v. Kelly* (1973) 10 Cal.3d 565, 573 [111 Cal.Rptr. 171, 516 P.2d 875].) "Unconsciousness does not mean that the actor lies still and unresponsive. Instead, a person is deemed 'unconscious' if he or she committed the act without being conscious thereof." (*People v. Haley* (2004) 34 Cal.4th 283, 313 [17 Cal.Rptr.3d 877, 96 P.3d 170]; *People v. Ochoa, supra,* 19 Cal.4th at pp. 423–424.) A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case. (See generally *People v. Breverman, supra,* 19 Cal.4th at p. 157.)

Here, defendant did not apparently rely upon the defense of unconsciousness. No expert testified that defendant was unconscious during either killing; nor did defendant himself testify he was unconscious, but only that he could not later recall the killings. Further, defense counsel during argument did not articulate a theory of unconsciousness.

Accordingly, the trial court was obligated to instruct on that defense only if substantial evidence supported it. Defendant contends his testimony that he had no independent memory of the Clark killing from the time he pushed the victim out of the truck, coupled with expert testimony suggesting that defendant "blacked out" and could not remember the incident, warranted an unconsciousness instruction with respect to the Clark count. (See *People v. Wilson* (1967) 66 Cal.2d 749, 762–763 [59 Cal.Rptr. 156, 427 P.2d 820] [unconsciousness instruction warranted where defendant testified he did not remember shootings and was "distraught and mentally exacerbated" by the events preceding the shootings].) The defense experts' testimony, however, fairly read, does not imply that he was unconscious during the events. Rather,

it suggests he was aware of the events as they were occurring, but reacted to them emotionally rather than logically. For example, Dr. Glaser testified the killing was an emotional, "impulsive heat of passion event," and Dr. Bird testified the killing was an impulsive, emotional act of passion and fear. Further, defendant's own testimony that he could not remember portions of the events, standing alone, was insufficient to warrant an unconsciousness instruction. (*People v. Froom* (1980) 108 Cal.App.3d 820, 829–830 [166 Cal.Rptr. 786] [evidence defendant was forgetful and told a psychiatrist he "awakened" after the crime was committed did not entitle defendant to an unconsciousness instruction]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 10 [107 Cal.Rptr. 859] [there is no "ineluctable rule" that a defendant's inability to remember supplies an evidentiary foundation for an unconsciousness instruction]; cf. *People v. Coston* (1947) 82 Cal. App. 2d 23, 40 [185 P.2d 632] ["a defendant's mere statement of forgetfulness, unsupported by any other evidence, is at most very little evidence of unconsciousness at the time of performing a particular act"].)

The only evidence supporting an unconsciousness instruction with regard to the Benintende count was defendant's confession and his testimony that he had "no memory" of that killing. Defendant's experts did not testify regarding his mental state during that killing, and there was no other evidence of the circumstances surrounding that crime. Defendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction. (*People v. Heffington, supra,* 32 Cal.App.3d at p. 10; *People v. Coston, supra,* 82 Cal.App.2d at p. 40.)

11. *Asserted dilution of the reasonable doubt standard*

Defendant contends several then-standard jury instructions given in his case—on the sufficiency of circumstantial evidence to prove specific intent (CALJIC No. 2.02), willfully false witnesses (CALJIC No. 2.21), weighing conflicting testimony (CALJIC No. 2.22), sufficiency of the testimony of one witness (CALJIC No. 2.27), and motive (CALJIC No. 2.51)—individually and collectively operated to dilute application of the constitutionally required reasonable doubt standard. He contends the error violated his rights to due process, to a jury trial, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, thereby requiring reversal without an inquiry into prejudice. (See *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068]; see also *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278–282 [124 L.Ed.2d 182, 113 S.Ct. 2078].)

We previously have rejected claims that the challenged instructions, alone or in combination, somehow dilute or undermine the reasonable doubt

standard and thus deprive defendants of due process. (E.g., *People v. Samuels* (2005) 36 Cal.4th 96, 131 [30 Cal.Rptr.3d 105, 113 P.3d 1125] [CALJIC No. 2.01 does not undermine the requirement of proof beyond a reasonable doubt]; *People v. Stitely* (2005) 35 Cal.4th 514, 555–556 [26 Cal.Rptr.3d 1, 108 P.3d 182] [CALJIC No. 2.01 does not diminish prosecution's burden of proof]; *People v. Stewart, supra,* 33 Cal.4th at p. 521 [CALJIC Nos. 2.01 and 2.02 do not unconstitutionally lessen the prosecution's burden of proof]; *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820] [CALJIC Nos. 2.21.2 and 2.22 do not improperly lessen the prosecution's burden of proof; CALJIC No. 2.51 does not relieve the prosecution of its burden of proof]; *People v. Frye* (1998) 18 Cal.4th 894, 958 [77 Cal.Rptr.2d 25, 959 P.2d 183] [CALJIC No. 2.51 does not shift the burden of proof to defendant]; *People v. Noguera* (1992) 4 Cal.4th 599, 633–634 [15 Cal.Rptr.2d 400, 842 P.2d 1160] [CALJIC Nos. 2.02, 2.21, and 2.27 do not permit conviction upon proof less than beyond a reasonable doubt].) We decline to revisit these holdings. Because defendant's Sixth and Eighth Amendment claims are intertwined with his due process claim, we reject those claims for the same reasons. (See *People v. Samuels, supra,* 36 Cal.4th at p. 131 [CALJIC No. 2.01 does not violate Sixth Amendment]; *People v. Stitely, supra,* 35 Cal.4th at pp. 555–556 [CALJIC No. 2.01 does not violate defendant's rights to trial by jury and to a reliable verdict].)

Defendant asserts the instructions cumulatively diluted the burden of proof. As noted above, however, several of our previous cases involved challenges to multiple instructions and we have rejected such claims. We do so again. Here the jury was instructed on the presumption of innocence and reasonable doubt under the then standard California instruction, CALJIC No. 2.90. The United States Supreme Court has held that this instruction satisfies due process requirements. (*Victor v. Nebraska, supra,* 511 U.S. at pp. 7–17; *People v. Millwee* (1998) 18 Cal.4th 96, 161 [74 Cal.Rptr.2d 418, 954 P.2d 990].) No federal constitutional violation occurred.

### 12. *Cumulative instructional error*

Defendant asserts "the combined effect of the many and critical instructional lacunae was to preclude the jury from considering any coherent theory of defense" and to "eliminate[] from the jury's consideration any alternative to a verdict of death eligibility," in violation of defendant's rights to due process, a fair jury trial, and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. To the extent this claim simply restates defendant's claim under *Beck v. Alabama, supra,* 447 U.S. at page 627, it fails for the same reason the *Beck* claim fails: because the jury properly was instructed on implied malice second degree murder and voluntary manslaughter under a

heat-of-passion theory, there was at least one applicable lesser included offense presented to the jury related to the Clark count. Thus the instructions in combination neither precluded the jury from considering any coherent theory of defense, nor eliminated from the jury's consideration any alternative to a verdict rendering defendant death eligible.

To the extent defendant contends the combined prejudicial effect of the instructional errors identified above resulted in the denial of a fundamentally fair trial in violation of the Fourteenth Amendment's due process guarantee (see *People v. Hill* (1998) 17 Cal.4th 800, 844–848 [72 Cal.Rptr.2d 656, 952 P.2d 673]) or brought about a miscarriage of justice (see *People v. Jackson* (1991) 235 Cal.App.3d 1670, 1681 [1 Cal.Rptr.2d 778]), we disagree. We have found only the following errors or assumed errors related to the Clark count: the failure to instruct on express malice second degree murder and involuntary manslaughter, and error in the concurrence instruction. We already have considered the effect of the erroneous concurrence instruction on the failure to instruct on express malice second degree murder and have found these errors in combination to be harmless. The assumed error in the failure to instruct on involuntary manslaughter was independent of the second degree murder and concurrence instruction errors. Under these circumstances, the errors and assumed errors in combination did not render defendant's trial fundamentally unfair. (See *People v. Davis* (2005) 36 Cal.4th 510, 572–573 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *People v. Malone* (1988) 47 Cal.3d 1, 56 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Bloyd* (1987) 43 Cal.3d 333, 356 [233 Cal.Rptr. 368, 729 P.2d 802].)

We have found the following errors related to the Benintende count: the failure to instruct on circumstantial evidence, and error in the concurrence instruction. The latter of these errors was harmless, because the issue posed by the incorrect instruction was resolved adversely to defendant under other instructions and because the erroneous instruction at worst imposed a burden on the prosecution more onerous than the law required. This error thus did not result in any prejudice to defendant that could cumulate. The error in the circumstantial evidence instruction was harmless because the circumstantial evidence supporting a finding defendant killed Benintende was not reasonably susceptible of an interpretation consistent with innocence, whereas the evidence supporting a finding defendant did not kill Benintende was weak or nonexistent. Because this error standing alone did not render the trial fundamentally unfair, reversal is not required. (*People v. Davis, supra,* 36 Cal.4th at pp. 572–573; *People v. Malone, supra,* 47 Cal.3d at p. 56; *People v. Bloyd, supra,* 43 Cal.3d at p. 356.)

### G. *Asserted erroneous jury instructions—special circumstance*

Defendant asserts the trial court erred in failing to instruct that the multiple-murder special circumstance, section 190.2, subdivision (a)(3), required a finding of intent to kill for both murders. He points out that these crimes took place in the "window period" between *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] and *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], and therefore an intent to kill was required in order to impose the death penalty. He acknowledges the jury necessarily found he intended to kill Clark when it convicted him of deliberate and premeditated murder, but he asserts the implied malice instructions did not require the jury to find he intended to kill Benintende.

In *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153–154 [197 Cal.Rptr. 79, 672 P.2d 862], we construed the felony-murder special circumstance of the 1978 death penalty law, section 190.2, subdivision (a)(17), to require an intent to kill in all instances, even when the defendant was the actual killer. We did so in part to avoid potential Eighth Amendment and equal protection problems that might result from a construction not requiring such intent. (*Carlos v. Superior Court, supra,* 35 Cal.3d at pp. 147–153, discussing *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].) In *People v. Turner,* a case involving two murders tried solely on a felony-murder theory, we applied the rationale of *Carlos* to hold that the multiple-murder special circumstance also requires an intent to kill. (*People v. Turner, supra,* 37 Cal.3d at pp. 328–329.)

In light of intervening United States Supreme Court authority (*Cabana v. Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689] and *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676]), we partially overruled *Carlos* and *Turner* in *People v. Anderson.* We held in *Anderson* that intent to kill is not an element of the felony-murder or multiple-murder special circumstances, but that when the defendant is an aider and abettor rather than the actual killer, intent to kill must be proved. (*People v. Anderson, supra,* 43 Cal.3d at pp. 1138–1150.) We since have held that due process and ex post facto principles preclude applying *Anderson* to defendants who committed their crimes in the "window period" between *Carlos* and *Anderson.* (*People v. Haley* (2004) 34 Cal.4th 283, 309 [17 Cal.Rptr.3d 877, 96 P.3d 170]; *People v. Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) We similarly have applied *Turner* in cases involving crimes committed between the decisions in *Turner* and *Anderson.* (*People v. Maury, supra,* 30 Cal.4th 342, 430; *People v. Johnson, supra,* 6 Cal.4th at p. 45.)

This is a "window period" case: the Benintende and Clark homicides occurred in January 1986 and February 1987, respectively, after we decided

*Turner* but before our decision in *Anderson.* Accordingly, for the special circumstance of multiple murder to be found true, the jury was required to find intent to kill for at least one of the murders. As defendant acknowledges, however, we previously have rejected the precise contention he now makes: that *Turner* required an intent-to-kill finding for *both* murders. (*People v. Dennis* (1997) 17 Cal.4th 468, 515–517 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) As we explained: "We have never held that the multiple murder special circumstance requires a jury to find the defendant intended to kill every victim. We also have never held that the intent to kill one victim and the implied malice murder of a second victim is insufficient to establish a multiple-murder special circumstance." (*People v. Dennis, supra,* 17 Cal.4th at p. 516.)

■ *Dennis* disposes of defendant's claims. Our state law never has required a jury to find intent to kill both. victims in order for the multiple-murder special circumstance to be found true.[32] Defendant asks us to reconsider *Dennis* in light of federal constitutional principles, but we perceive no conflict between those principles and *Dennis.* Because the jury necessarily found defendant intended to kill Clark when it found him guilty of her premeditated murder, none of *Turner*'s Eighth Amendment "concerns about imposing the death penalty for an unintentional killing is involved." (*People v. Dennis, supra,* 17 Cal.4th at p. 517.)

H. *Constitutionality of the death penalty statute*

Defendant attacks the constitutionality of California's death penalty statute on a number of grounds. We have rejected most of these claims, and we decline to revisit these holdings. Specifically, we have held: "section 190.2— setting out the special circumstances that, if found true, render a defendant eligible for the death penalty—adequately narrows the category of death-eligible defendants in conformity with the requirements of the Eighth and Fourteenth Amendments." (*People v. Blair, supra,* 36 Cal.4th at p. 752; see

---

[32] *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081] and *People v. Maury, supra,* 30 Cal.4th 342 are not to the contrary. In *Coddington,* we did not address the merits of the defendant's claim that the trial court erred in failing to instruct that the multiple-murder special circumstance required a finding of "specific intent to kill each victim," instead finding only that any possible error was harmless. (*People v. Coddington, supra,* 23 Cal.4th at pp. 594–595, overruled on other grounds in *Price v. Superior Court, supra,* 25 Cal.4th at p. 1069, fn. 13.) In *Maury,* the trial court instructed the jury it had to find intent to kill in at least two of the murders of which the defendant was found guilty. The defendant contended the court erroneously instructed on the intent requirement with respect to aider and abettor liability. (*People v. Maury, supra,* 30 Cal.4th at pp. 430–432.) We concluded, based upon the instructions and the evidence, that if the jury predicated any murder liability on an aiding-and-abetting theory, it necessarily found the defendant intended to kill. (*Ibid.*) We did not address the question whether it was correct to require intent to kill for more than one of the murders.

also *People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384].) The multiple-murder special circumstance, section 190.2, subdivision (a)(3), is not overly broad and does not focus improperly on the nature of the act rather than on the defendant's mental state. (*People v. Lucero, supra,* 23 Cal.4th at p. 740; see also *People v. Sapp, supra,* 31 Cal.4th at pp. 286–287.)

"The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors." (*People v. Blair, supra,* 36 Cal.4th at p. 753; see also *People v. Davis, supra,* 36 Cal.4th at p. 571.) "[N]either the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.] Indeed, the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase." (*People v. Blair, supra,* 36 Cal.4th at p. 753; see also *People v. Davis, supra,* 36 Cal.4th at p. 571.) That certain noncapital sentencing proceedings may require jury unanimity or proof beyond a reasonable doubt does not mean the death penalty statute violates the equal protection clause of the Fourteenth Amendment. (See *People v. Blair, supra,* 36 Cal.4th at p. 754; *People v. Davis, supra,* 36 Cal.4th at pp. 571–572.) Further, the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) do not compel a different answer to these questions. (*People v. Blair, supra,* 36 Cal.4th at p. 753; *People v. Davis, supra,* 36 Cal.4th at p. 572.)

The use of the qualifier "extreme" in section 190.3, factors (d) ("extreme mental or emotional disturbance") and (g) ("extreme duress") does not unconstitutionally limit the jury's consideration of mitigating evidence in violation of the Eighth or Fourteenth Amendments and does not render those factors unconstitutionally vague. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Blair, supra,* 36 Cal.4th at pp. 753–754; *People v. Arias, supra,* 13 Cal.4th at pp. 188–189.) Nor does the term "reasonabl[e] belie[f]" in section 190.3, factor (f) (reasonable belief in moral justification) unconstitutionally restrict the jury's consideration of mitigating evidence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Lang* (1989) 49 Cal.3d 991, 1037 [264 Cal.Rptr. 386, 782 P.2d 627].)

There is no requirement under the jury trial guarantee of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, or the due process or equal protection guarantees of the Fourteenth Amendment that a jury find the existence of unadjudicated criminal activity under section 190.3, factor (b), unanimously or beyond a reasonable doubt. (*People v. Blair, supra,* 36 Cal.4th at p. 753; *People v. Davis, supra,* 36 Cal.4th at p. 571; see also *People v. Prieto* (2003) 30 Cal.4th 226, 262–265 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [*Ring* does not require that jury unanimously find beyond a reasonable doubt that unadjudicated criminal acts involved force or violence].) Use of the same jury that has adjudged a defendant guilty of first degree murder with special circumstances to determine at the penalty phase whether he or she committed unadjudicated criminal acts does not violate the impartial-jury requirement of the Sixth Amendment. (*People v. Stanley* (1995) 10 Cal.4th 764, 821–822 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480].) The consideration of unadjudicated criminal acts does not violate defendant's Sixth Amendment rights to a speedy trial. (See *People v. Stanley, supra,* 10 Cal.4th at pp. 822–823.) Nor did such consideration here violate defendant's right to confront the witnesses; defendant was able to confront both Butler and Martinez when they testified against him. (Cf. *People v. Rodrigues, supra,* 8 Cal.4th at p. 1161 [no confrontation violation from use of unadjudicated criminal act at penalty phase where defendant was able to confront the witnesses who were available].)

The discretion given to prosecutors to decide when to seek the punishment of death does not render the death penalty statute arbitrary or vague in violation of the Eighth Amendment, nor does it violate the equal protection or due process clauses. (*People v. Harris, supra,* 37 Cal.4th at p. 366; *People v. Carter* (2005) 36 Cal.4th 1215, 1280 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *People v. Barnett, supra,* 17 Cal.4th at p. 1179.)

Contrary to defendant's contention, "intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution." (*People v. Blair, supra,* 36 Cal.4th at p. 753; see also *People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

On the other hand, a capital defendant is entitled under the California Constitution to *intra*case proportionality review to determine whether the penalty of death is disproportionate to the defendant's culpability. (*People v. Horning* (2004) 34 Cal.4th 871, 913 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1130 [12 Cal.Rptr.3d 592, 88 P.3d 498].) Defendant argues no "meaningful" intracase proportionality review was conducted at trial. We interpret defendant's argument as a request to

perform such review on appeal. (See *People v. Horning, supra,* 34 Cal.4th at p. 913.) To determine whether defendant's sentence is disproportionate to his individual culpability, we examine the circumstances of the offense, including its motive, the extent of defendant's involvement, the manner in which the crime was committed, the consequences of defendant's acts, and defendant's personal characteristics including age, prior criminality, and mental capabilities. (*People v. Steele, supra,* 27 Cal.4th at 1269.) Here, the jury found that defendant, acting alone, shot to death two young women, one of whom was only 15 years of age, in part to save himself from embarrassment and the adverse personal and employment consequences that might have ensued had his involvement with prostitutes become known. Defendant not only was a mature man in his forties at the time of the crimes; he also was a deputy sheriff who was knowledgeable concerning the law and was charged with protecting the public. The jury rejected defendant's mental state defense. "[T]hese circumstances do not demonstrate that defendant's death sentence is disproportionate." (*People v. Wilson* (2005) 36 Cal.4th 309, 361 [30 Cal.Rptr.3d 513, 114 P.3d 758]; see also *People v. Steele, supra,* 27 Cal.4th at p. 1269.)

Defendant makes two new arguments. First, defendant contends section 190.3, factor (h), which allows the jury to consider whether "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect" or intoxication, unconstitutionally limits the jury's consideration of mitigating evidence, because the jury would understand it to mean the defendant's mental illness may not be considered unless it caused the commission of the crime. We disagree. First, we do not believe the jury would understand the factor to be so limited. Even if it did, section 190.3, factor (k) and its corresponding instruction allow a jury to consider any aspect of the defendant's character or record that calls for a sentence less than death, including, in this instance, mental illness of the defendant that did not cause the crime in question. (See *People v. Hughes* (2002) 27 Cal.4th 287, 405, fn. 33 [116 Cal.Rptr.2d 401, 39 P.3d 432] [use of temporal language in factor (h) does not preclude jury from considering constitutionally relevant evidence]; cf. *People v. Jenkins, supra,* 22 Cal.3d at p. 1055; *People v. Arias, supra,* 13 Cal.4th at pp. 188–189.) Factor (h) therefore does not violate the Eighth Amendment.

Second, defendant asserts section 190.3, factor (g), which allows the jury to consider whether the defendant acted "under extreme duress or under the substantial domination of another person," is an "illusory" factor because it never could apply under any set of facts in a first degree murder case. Even were we to accept this argument, defendant would not benefit from such a holding, for duress was not even arguably an issue in his case. Defendant acted alone in killing Benintende and Clark. Thus, a finding that factor (g) is

somehow deficient would not cause us to upset the penalty judgment. (Cf. *People v. Visciotti, supra,* 2 Cal.4th at p. 75 [trial court's response to jury question concerning the meaning of "extreme duress" did not prejudice defendant, where no evidence of duress was offered].)

### I. *Asserted penalty phase instructional errors*

Defendant raises several challenges to the standard penalty phase jury instructions, and also asserts the instructions actually given in his case were in error in several specific respects. We find no prejudicial error.

#### 1. *Adequacy of the record*

There is no record of any discussions regarding the content of penalty phase jury instructions. According to the settled statement, an unreported discussion took place in chambers on May 8, 1988, during the guilt phase presentation of evidence, regarding "procedures for selection of jury instructions for the penalty phase." However, "[n]o one recalls the content of any subsequent discussions concerning selection of death penalty instructions or whether a subsequent discussion occurred." There is no indication in the record that any subsequent discussion of penalty phase jury instructions was held. Further, the clerk's transcript indicates there were no instructions submitted by either party that were not given. A face sheet attached to the penalty phase instructions that were given states: "The attached INSTRUCTIONS for the above entitled action consist of 9 pages as submitted to the Court by counsel for the respective parties." Nine pages of instructions follow. A face sheet regarding penalty phase instructions not given states: "The attached INSTRUCTIONS for the above entitled action consist of 0 pages as submitted to the Court by counsel for the respective parties." No pages of instructions follow.

Defendant contends the record is inadequate to permit meaningful appellate review of his claims of penalty phase instructional error. We disagree. Here, in contrast to the discussions shown to have taken place regarding jury instructions to be given at the conclusion of the guilt phase, there is no affirmative evidence in the record that any unrecorded discussion of the contents of the penalty phase jury instructions took place. The settled statement indicates an unrecorded discussion occurred concerning the procedures for selecting penalty phase instructions, but not a discussion concerning which instructions would be given or how the instructions would be worded. Accordingly, we may conclude that no such discussion took place. Further, the clerk's transcript shows that defense counsel did not request any instructions that were not given.

Defendant's reliance upon *People v. Young, supra,* 34 Cal.4th 1149, again is misplaced. There, we presumed instructional errors were preserved for

review, because it was clear that portions of the record regarding discussions of jury instructions were missing. (*People v. Young, supra,* 34 Cal.4th at pp. 1202–1203, 1225.) Here, there is no indication that any relevant portion of the record is missing. The record therefore is adequate to permit meaningful review of defendant's jury instruction claims.

## 2. *Asserted errors in the standard instructions*

Defendant challenges the standard penalty phase jury instructions, CALJIC Nos. 8.84.1 and 8.84.2, on several grounds. As defendant acknowledges, we have rejected many of the precise arguments he raises here. Thus, we have held the trial court need not identify which particular factors are aggravating and which are mitigating. (*People v. Kennedy* (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].) It follows the trial court need not instruct that background evidence may be considered only in mitigation. Further, the instructions "need not explicitly label a factor such as extreme mental or emotional disturbance as mitigating, provided there is no reasonable likelihood jurors misunderstood the instruction in a way that violated the defendant's rights." (*People v. Dunkle* (2005) 36 Cal.4th 861, 924 [32 Cal.Rptr.3d 23, 116 P.3d 494]; see also *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Here, defense counsel strenuously argued defendant's mental and emotional problems were factors in mitigation. The prosecutor did not argue those same factors were aggravating; rather she argued that the evidence suggesting defendant suffered from such problems was unconvincing. Under these circumstances, we find "no reasonable likelihood the jury considered evidence of defendant's mental illness as aggravating." (*People v. Dunkle, supra,* 36 Cal.4th at pp. 924–925 [no reasonable likelihood jury misconstrued section 190.3, factor (d) to allow it to consider defendant's mental illness in aggravation, where nothing in the prosecutor's argument suggested such a conclusion and some of the evidence identified by defendant as potentially aggravating was elicited by the defense].)

The trial court need not instruct that the beyond-a-reasonable-doubt standard and the requirement of jury unanimity do not apply to mitigating factors. (See *People v. Breaux* (1991) 1 Cal.4th 281, 314–315 [3 Cal.Rptr.2d 81, 821 P.2d 585] [jury unanimity].) The trial court also need not instruct that the absence of a mitigating factor is not aggravating. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1193–1194 [13 Cal.Rptr.3d 34, 89 P.3d 353].) The trial court is not obligated to define the terms "aggravating" and "mitigating," even upon request, because they are commonly understood. (*People v. Hawkins, supra,* 10 Cal.4th at p. 965; *People v. Malone, supra,* 47 Cal.3d at pp. 54–55.)

The trial court is not required to instruct on its own motion that the only aggravating factors the jury may consider are those specified in section 190.3.

(E.g., *People v. Taylor* (2001) 26 Cal.4th 1155, 1180 [113 Cal.Rptr.2d 827, 34 P.3d 937]; cf. *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15] [refusal to so instruct did not violate Eighth Amendment's "narrowing" requirement].)

Although the trial court should have instructed that section 190.3, factors (b) (other criminal activity involving force or violence) and (c) (prior felony convictions) pertain only to criminal activity other than that for which defendant was convicted in the present proceeding (*People v. Sanchez* (1995) 12 Cal.4th 1, 78 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Fudge, supra,* 7 Cal.4th at p. 1125; *People v. Montiel* (1993) 5 Cal.4th 877, 938 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People v. Miranda* (1987) 44 Cal.3d 57, 105–106 & fn. 28 [241 Cal.Rptr. 594, 744 P.2d 1127]), the error in the present case was harmless (see *People v. Hardy, supra,* 2 Cal.4th at p. 205). As we have stated, absent an invitation to do so by the prosecutor, " 'jurors are unlikely to give the circumstances of the current crime greater weight in the penalty determination simply because they appear to be included in two separate categories of statutory "aggravation." ' " (*People v. Webster* (1991) 54 Cal.3d 411, 453 [285 Cal.Rptr. 31, 814 P.2d 1273]; see also *People v. Hardy, supra,* 2 Cal.4th at p. 205.) Here, the prosecutor did not exploit the potential ambiguity in factor (b); rather, the only matter she argued as relevant to factor (b) was the assault on Tambri Butler. Thus, there is no reasonable possibility the instructional error affected the verdict.[33] (*People v. Fudge, supra,* 7 Cal.4th at p. 1126; *People v. Hardy, supra,* 2 Cal.4th at p. 205.)

The trial court was not required to tell the jury it could consider defendant's mental and emotional problems under section 190.3, factors (d) and (h) even though it had rejected his guilt phase defenses. Defendant contends that absent such an instruction, the jury would have concluded those factors were not applicable under the trial court's instruction to consider each of the listed factors "if applicable." We disagree. In argument, the parties extensively discussed the evidence relevant to factors (d) and (h). No one suggested this evidence could not be considered simply because it did not establish a defense to the charges. (See *People v. Hernandez* (1988) 47 Cal.3d 315,

---

[33] Relying on *People v. Lucero* (1988) 44 Cal.3d 1006 [245 Cal.Rptr. 185, 750 P.2d 1342], defendant contends the absence of an instruction limiting section 190.3, factor (b) may have deprived him of the potentially mitigating factor of the *absence* of prior criminal activity involving force or violence. In that case, we held prosecutorial argument erroneously urging the jury to consider the circumstances of the crime under factor (b) may have deprived the defendant of the potentially mitigating factor of the absence of prior criminal activity, when no additional aggravating evidence was introduced at the penalty phase. (*People v. Lucero, supra,* 44 Cal.3d at p. 1031, fn. 15.) The present case is unlike *Lucero.* Here, the prosecutor did not argue the Benintende and Clark incidents could be considered under factor (b). Moreover, because the prosecutor introduced the Butler incident in aggravation, there was only a minimal chance the jury would have found the absence of prior criminal activity a mitigating factor.

359–360 [253 Cal.Rptr. 199, 763 P.2d 1289] [prosecutor's argument did not suggest jury could not consider mitigating evidence if such evidence did not establish insanity or other legal defense].) Accordingly, the jury would not have been misled to believe factors (d) and (h) were inapplicable. Moreover, even if the jury determined those factors were inapplicable, it still could consider evidence of defendant's mental illness under the expansive language of section 190.3, factor (k), which allowed it to consider any aspect of defendant's character or record or background offered by the defense as a reason to impose a sentence of life imprisonment without possibility of parole. Under these circumstances, neither error nor prejudice appears.

The trial court was not required to define the terms "mental or emotional disturbance" in section 190.3, factor (d). (*People v. Holt, supra,* 15 Cal.4th at p. 699.) Defendant argues the court was obligated to instruct that evidence of mental or emotional disturbance could be considered in mitigation even if there was no reasonable explanation or excuse for such disturbance. Although we agree the scope of factor (d) is broad (see *People v. Holt, supra,* 15 Cal.4th at p. 695), defendant cites no authority supporting such a clarifying instruction, and we are unaware of any.

The trial court was not required to tell the jury it had discretion to impose the punishment of life imprisonment without possibility of parole even in the absence of any mitigating factors. (*People v. Anderson, supra,* 25 Cal.4th at p. 600, fn. 20; cf. *People v. Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131] [jury may return such a verdict even in the complete absence of mitigating evidence].)

The federal Constitution does not compel a trial court to instruct that a sentence of life imprisonment without possibility of parole actually signifies the defendant never will be paroled. (*People v. Kennedy, supra,* 36 Cal.4th at p. 641.)

The failure to instruct the jury to disregard the guilt phase instruction to reach a verdict " 'regardless of the consequences' " did not prejudice defendant. (See *People v. Kipp* (1998) 18 Cal.4th 349, 379–380 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Arias, supra,* 13 Cal.4th at p. 171.) At the penalty phase, the court did not repeat the instruction; the jury was instructed to consider the statutory sentencing factors—including the expansive section 190.3, factor (k)—and to disregard any conflicting guilt phase instructions, and the prosecutor's argument did not seek to exploit the notion that the " 'regardless of the consequences' " instruction applied at the penalty phase. The jury was not misled. (*People v. Kipp, supra,* 18 Cal.4th at pp. 379–380; *People v. Arias, supra,* 13 Cal.4th at p. 171.)

The trial court was not obligated to instruct that the jury had to choose life imprisonment without possibility of parole if it found the mitigating circumstances outweighed the aggravating circumstances. (*People v. Kipp, supra,* 18 Cal.4th at p. 381; *People v. Barnett, supra,* 17 Cal.4th at pp. 1176–1177; *People v. Stankewitz* (1990) 51 Cal.3d 72, 109 [270 Cal.Rptr. 817, 793 P.2d 23].)

The trial court instructed the jury pursuant to CALJIC No. 8.84.2: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The trial court was not required to provide a standard for comparing mitigating and aggravating circumstances other than the "so substantial" standard. (See *People v. Millwee, supra,* 18 Cal.4th at pp. 162–163; *People v. Arias, supra,* 13 Cal.4th at pp. 170–171.) The phrase "so substantial" is not unconstitutionally vague. (*People v. Sanchez, supra,* 12 Cal.4th at p. 81; *People v. Breaux, supra,* 1 Cal.4th at pp. 315–316.) Further, CALJIC No. 8.84.2 is not unconstitutional due to its failure to instruct that the central penalty phase determination is whether the death penalty is "appropriate." (*People v. Breaux, supra,* 1 Cal.4th at pp. 315–316.)

To the extent our previous cases have not addressed defendant's constitutional arguments, we note that the Eighth Amendment places no constraints on a jury's discretion in choosing the appropriate sentence between life imprisonment without possibility of parole and the death penalty, as long as the special circumstances have narrowed suitably the class of death-eligible defendants and the sentencing jury is permitted to make an individualized determination based upon the defendant's character and record, guided by specific and relevant factors. (*People v. Musselwhite, supra,* 17 Cal.4th at pp. 1267–1268, citing *Zant v. Stephens* (1983) 462 U.S. 862, 875 [77 L.Ed.2d 235, 103 S.Ct. 2733]; see also *People v. Bacigalupo* (1993) 6 Cal.4th 457, 477–478 [24 Cal.Rptr.2d 808, 862 P.2d 808].) As we have explained, the California death penalty law and accompanying jury instructions fulfill those purposes. Moreover, to the extent defendant argues the instructions denied him due process of law by arbitrarily depriving him of a benefit provided under state law (see *Hicks v. Oklahoma, supra,* 447 U.S. 343), his argument fails because, as we have explained, state law does not mandate the instructions he seeks.

### 3. *Asserted errors specific to this case*

#### a. *The misstating of CALJIC No. 8.84.1, factor (d)*

CALJIC No. 8.84.1, factor (d), instructs the jury to consider "[w]hether or not the offense was committed while the defendant was under the influence of

extreme mental or emotional disturbance." Here (assuming the correctness of the reporter's transcript), the trial court misread the standard instruction, omitting the word "mental." Thus, the court instructed the jury to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme or emotional disturbance." Apparently, neither the trial court nor counsel was aware of the mistake. Defendant argues the error would have led the jury to believe it could not consider evidence of his mental disturbance in aggravation, violating his right to a reliable penalty verdict under the Eighth and Fourteenth Amendments to the United States Constitution.

State law error at the penalty phase requires reversal when there is a reasonable possibility the error affected the verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 447–448 [250 Cal.Rptr. 604, 758 P.2d 1135].) That standard is "the same, in substance and effect, as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762], italics omitted; see also *People v. Ochoa, supra,* 19 Cal.4th at p. 479.)

Although the trial court erred, the error was harmless under either standard. We do not believe the jury would have understood the court's oral instruction to preclude the consideration of defendant's mental problems in mitigation. The jury would not have considered "mental" disturbance to be a separate category from "emotional" disturbance, which the oral instructions told the jury to consider. Moreover, the jury requested and received written copies of the instructions. The written CALJIC No. 8.84.1, factor (d) instruction was correct. In argument, the prosecutor correctly reiterated that the jury was to consider whether defendant committed the offense while under the influence of "extreme mental or emotional disturbance." Both parties in argument addressed the mitigating force, or lack thereof, of defendant's mental and emotional problems. There is no reasonable possibility the error affected the verdict, and any error was harmless beyond a reasonable doubt.

> b. *The modification of CALJIC No. 8.84.1, factors (f), (g), and (h)*

Defendant contends the trial court improperly modified CALJIC No. 8.84.1 by striking out portions of factors (f), (g), and (h) that were applicable to his case.[34] Defendant contends this error denied him a fair and reliable sentencing under the Eighth Amendment, because the jury was prevented from

---

[34] The trial court also deleted portions of CALJIC No. 8.84.1, factors (e) and (j), but defendant does not challenge these deletions.

considering all constitutionally relevant evidence and was deprived of the opportunity to consider defendant's conduct in the context of the full range of available factors.

The court altered the standard text of CALJIC No. 8.84.1 by instructing the jury to consider:

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a ~~moral justification or~~ extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress ~~or the substantial domination of another person.~~

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect ~~or the affects~~ [*sic*] ~~of intoxication.~~"

 We have held on numerous occasions that the trial court is not *required* to delete inapplicable mitigating factors from the penalty instructions. (E.g., *People v. Carter, supra,* 36 Cal.4th at p. 1280; *People v. Kennedy, supra,* 36 Cal.4th at p. 641; *People v. Miranda, supra,* 44 Cal.3d at pp. 104–105.) Conversely, we have held a trial court is not obligated to instruct on all the statutory penalty factors on its own motion. (*People v. Marshall* (1990) 50 Cal.3d 907, 932 [269 Cal.Rptr. 269, 790 P.2d 676].) In *People v. Freeman, supra,* 8 Cal.4th at page 524, we rejected the contention a trial court had erred by deleting certain factors, stating: "Although the court need not delete inapplicable factors [citation], it is not error of which defendant can complain to do what defendants have long urged."

Here, instruction on the deleted factors was not required, because no substantial evidence supported the deleted factors. The factors deleted by the trial court were whether or not defendant reasonably believed his conduct was morally justified, whether or not defendant acted under the substantial domination of another person, and whether or not defendant's capacity to conform his conduct to the requirements of the law was impaired by the effects of intoxication. There was no evidence defendant believed his conduct was morally justified, no evidence any other person was involved in the murders or forced defendant to commit them, and no evidence defendant was intoxicated at the time of the crimes.

Defendant contends the jury might have construed his mental health experts' testimony to mean he acted under the "substantial domination" of his

abusive mother or stepfathers when he committed the crimes. We consider it highly unlikely the jury would have so interpreted this evidence. Further, defendant cites no case, and we are aware of none, construing CALJIC No. 8.84.1, factor (g)'s "substantial domination" language so broadly as to include the effects of remote childhood abuse.

Defendant also argues that declining to instruct on the "effects of intoxication" deprived the jury of the proper context for its penalty decision. He contends the mitigating impact of his evidence of mental impairment was diminished because the jury was not told that committing a crime while voluntarily intoxicated—a more blameworthy state than committing a crime while mentally impaired—also can be mitigating. Although we reiterate it is "the better practice for a court to instruct on all the statutory penalty factors" (*People v. Marshall, supra,* 50 Cal.3d at p. 932) precisely for reasons such as those invoked by defendant's argument, any error was harmless. Despite our inability to know for certain what mitigating weight the jury assigned to defendant's evidence of mental and emotional impairment, we discern no reasonable possibility that the penalty verdict would have differed had the jury been instructed that impairment resulting from voluntary intoxication can be mitigating.

 c. *The failure to instruct sua sponte on general principles*

Defendant contends the trial court erred by failing to instruct on several general principles of law that were applicable at the penalty phase.

 (i) *Instruction on failure to testify*

Defendant first asserts the trial court erred by failing to instruct on its own motion pursuant to CALJIC No. 2.60 that the jury should not draw any adverse inferences from defendant's failure to testify. As defendant recognizes, we have rejected this precise argument on numerous occasions. (E.g., *People v. Smith* (2003) 30 Cal.4th 581, 639 [134 Cal.Rptr.2d 1, 68 P.3d 302]; *People v. Holt, supra,* 15 Cal.4th at p. 687.)

 (ii) *Failure to specify applicable instructions*

At the guilt phase, the trial court instructed the jury on general principles applicable to the evaluation of evidence. Defendant contends the trial court erred by failing to reinstruct on these principles at the penalty phase or, at a minimum, to tell the jury which guilt phase instructions were applicable at the penalty phase. He contends this error deprived him of his right to a reliable penalty verdict under the Eighth Amendment to the federal Constitution.

We have held the trial court is not required to reinstruct on general principles at the penalty phase when the guilt phase instructions were not limited to use at the guilt phase and none of the penalty phase instructions contradict the guilt phase instructions. (*People v. Benavides* (2005) 35 Cal.4th 69, 112 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 73–74 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Here, at the penalty phase the jury was told to disregard only those guilt phase instructions that conflicted with the principles outlined in CALJIC No. 8.84.1, factor (k), and nothing in the parties' arguments or in the other instructions suggested that the general principles outlined at the guilt phase would not apply at the penalty phase. No error appears.[35]

Defendant contends the guilt phase instructions on witness credibility were incomplete. In giving CALJIC No. 2.20, the trial court deleted the final three factors: character or reputation for untruthfulness, prior admissions of lying, and prior felony convictions. Defendant argues these factors were crucial in evaluating the credibility of Martinez and Butler; therefore he was prejudiced when the trial court failed to reinstruct pursuant to the full CALJIC No. 2.20 at the penalty phase.

We conclude any error was harmless. There was no evidence of the first two factors—character or reputation for untruthfulness, or a prior admission of untruthfulness—regarding Butler or Martinez. And although the jury never was instructed to consider prior felony convictions in evaluating credibility, both women were examined and cross-examined on their criminal histories and their possible motives for testifying against defendant. There is no reasonable possibility the outcome of the penalty phase would have differed had the jury been instructed expressly to consider felony convictions in evaluating credibility. No prejudicial error appears.

### (iii) *Instructions on reasonable doubt and the presumption of innocence*

At the penalty phase, the jury was told that in order to consider, in aggravation, evidence of other criminal activity—that is, the assault on Tambri Butler with a firearm—it had to find the existence of such activity beyond a reasonable doubt. Defendant contends the trial court erred in failing to reinstruct at the penalty phase on the definitions of reasonable doubt and the presumption of innocence, pursuant to CALJIC No. 2.90. He contends the

---

[35] In *People v. Babbitt, supra,* 45 Cal.3d at page 718, footnote 26, we suggested: "To avoid any possible confusion in future cases, trial courts should expressly inform the jury at the penalty phase which of the instructions previously given continue to apply." *Babbitt* was decided in June 1988, after defendant's trial.

error affected the jury's consideration of the "other-crimes" evidence involving Butler and Ellen Martinez.

We previously have rejected the contention that a trial court is required to reinstruct at the penalty phase on the presumption of innocence, the prosecution's burden to prove guilt, or the meaning of reasonable doubt.[36] (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1020 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Benson* (1990) 52 Cal.3d 754, 809–810 [276 Cal.Rptr. 827, 802 P.2d 330].) "As we have explained, a reasonable juror would assume that 'generic' instructions given at the guilt phase continue to apply at the penalty phase." (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1020.) In a recent opinion, we concluded the trial court should have redefined reasonable doubt at the penalty phase. (*People v. Chatman* (2006) 38 Cal.4th 344, 407–408 [42 Cal.Rptr.3d 621, 133 P.3d 534].) In that case, however, the trial court had instructed the jury at the penalty phase to " '[d]isregard all other instructions given to you in other phases of this trial.' " (*People v. Chatman, supra,* 38 Cal.4th at p. 408; see also *People v. Holt, supra,* 15 Cal.4th at p. 685.) Here, by contrast, at the penalty phase the jury was told to disregard only those guilt phase instructions that conflicted with the principles of CALJIC No. 8.84.1, factor (k). The presumption of innocence and reasonable doubt instructions did not conflict with those principles. Under the circumstances, the general rule that the trial court is not required to reinstruct on general principles at the penalty phase applies. (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1020; see also *People v. Benavides, supra,* 35 Cal.4th at p. 112; *People v. Sanders, supra,* 11 Cal.4th at p. 561; *People v. Hawthorne, supra,* 4 Cal.4th at pp. 73–74.)

Further, assuming error, it was harmless beyond a reasonable doubt. The jury was fully and properly instructed on the concepts of reasonable doubt and the presumption of innocence at the guilt phase. There is no reasonable possibility the jury, having applied the reasonable doubt and presumption-of-innocence concepts at the guilt phase, had forgotten them by the time penalty phase deliberations began two weeks later.

### (iv) *Instructions on eyewitness identification*

Defendant asserts the trial court erred by failing to instruct on its own motion on the prosecution's burden to prove identity based upon eyewitness testimony (CALJIC No. 2.91) and the factors to consider in evaluating eyewitness testimony (CALJIC No. 2.92). He asserts these instructions were crucial for the jury properly to assess the testimony of Tambri Butler.

---

[36] The United States Supreme Court has not decided whether the federal Constitution requires the presumption of innocence to attach to other-crimes evidence introduced at the penalty phase of a capital trial. (*Delo v. Lashley* (1993) 507 U.S. 272, 279 [122 L.Ed.2d 620, 113 S.Ct. 1222].)

■ A trial court has no duty to instruct pursuant to CALJIC Nos. 2.91 and 2.92 on its own motion. (*People v. Alcala* (1992) 4 Cal.4th 742, 802–803 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; see also *People v. Ward, supra,* 36 Cal.4th at pp. 213–214 [no sua sponte duty to modify CALJIC No. 2.92].) Defendant's claim therefore fails.

### J. Asserted error in the consideration of the automatic motion to modify the verdict

Defendant contends the trial court deprived him of meaningful review of his automatic motion to modify the verdict under section 190.4, subdivision (e), in violation of his rights to a reliable penalty determination and to due process of law under the Eighth and Fourteenth Amendments to the United States Constitution.

■ Subdivision (e) of section 190.4 provides in pertinent part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." We have emphasized that in ruling on the modification application, " 'the trial court must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict. The court must state the reasons for its ruling on the record. On appeal, we independently review the trial court's ruling after reviewing the record, but we do not determine the penalty de novo.' (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].)" (*People v. Cleveland* (2004) 32 Cal.4th 704, 766–767 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

Defendant first contends the trial court impermissibly considered the following two items of evidence before ruling on the motion to modify: (1) a probation and sentencing report; and (2) the statement of Benintende's father, Fredrick Fredrek, which the prosecutor offered pursuant to section 1191.1.[37]

---

[37] At the time of the modification motion, section 1191.1 provided in pertinent part: "The victim of any crime . . . or the next of kin of the victim if the victim has died . . . . [¶] . . . has the right to appear, personally or by counsel, at the sentencing proceeding and to reasonably express his or her views concerning the crime [and] the person responsible . . . . The court in imposing sentence shall consider the statements of . . . next of kin made pursuant to this section . . . . " (Stats. 1984, ch. 1425, § 1, p. 5008.)

We first note that defendant did not object to the court considering either the probation report or Fredrek's statement. These claims of error therefore are forfeited. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1183 [64 Cal.Rptr.2d 892, 938 P.2d 950]; *People v. Dennis, supra,* 17 Cal.4th at p. 551.) Even were we to reach the merits, we would find no error.

In ruling on an automatic motion to modify, it is improper for a trial court to consider matters that were not before the jury. (*People v. Holt, supra,* 15 Cal.4th at p. 694; *People v. Cummings, supra,* 4 Cal.4th at p. 1331; *People v. Frank* (1990) 51 Cal.3d 718, 742 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) Thus, we recognize the better practice is for the court to rule on the motion to modify *before* reading any applicable probation reports (§ 1203, subds. (b), (g)) or hearing victim statements pursuant to section 1191.1. (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Lewis, supra,* 50 Cal.3d at p. 287.) The failure to do so is not error, however, where nothing in the record suggests the court relied on any impermissible material in ruling on the motion to modify. (*People v. Navarette, supra,* 30 Cal.4th at p. 526; *People v. Dennis, supra,* 17 Cal.4th at p. 551; *People v. Holt, supra,* 15 Cal.4th at p. 694.)

Here, we find no indication in the record that the court relied on either the report or Fredrek's statement in ruling on the motion to modify. Rather, after reviewing the aggravating and mitigating factors set out in section 190.3, the court denied the motion to modify, stating: "And when you take into consideration the circumstances of these crimes charged in this case and the circumstances of other crimes that came out, I think that the penalty of death is not unreasonable, and the court will impose it." In discussing the factors that had informed its decision to deny the motion, the court made no mention of matters contained in the probation report or in Fredrek's statement. Moreover, the court's explanation of its ruling demonstrates that it independently considered whether the aggravating and mitigating circumstances existed, and independently weighed them before denying the motion. (*People v. Navarette, supra,* 30 Cal.4th at p. 526; *People v. Ramos, supra,* 15 Cal.4th at p. 1184; *People v. Holt, supra,* 15 Cal.4th at p. 694; *People v. Cummings, supra,* 4 Cal.4th at p. 1331.)

Defendant asserts the trial court's consideration of Fredrek's statement in ruling on the motion to modify violated the Eighth Amendment prohibition on the sentencing authority's consideration of "characterizations and opinions about the crime, the defendant, and the appropriate sentence" of a victim's family member. (*Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2 [115 L.Ed.2d 720, 111 S.Ct. 2597].) As we have explained, however, nothing in the record suggests the trial court relied on Fredrek's statement in ruling

on the motion to modify. Moreover, as a general matter, this aspect of the United States Supreme Court's Eighth Amendment jurisprudence does not apply to automatic motions to modify a death verdict. (*People v. Ramos, supra,* 15 Cal.4th at p. 1184; *People v. Benson, supra,* 52 Cal.3d at p. 812.)

Defendant next contends the trial court erred by counting the circumstances of the Benintende and Clark murders under multiple factors. He asserts the trial court improperly considered the two homicide counts under section 190.3, factor (b) (other criminal activity involving force or violence), when it stated: "[G]oing to the second part of 190.3, the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence. [¶] Well, of course, both of these murders involve the use of force or violence." Counting the Clark and Benintende murders under factor (b) was improper, because that factor is limited to criminal activity other than crimes of which the defendant was convicted in the capital proceeding. (*People v. Montiel, supra,* 5 Cal.4th at p. 938.) Here, however, there is "no indication that the court believed that this criminal activity weighed more heavily on the aggravating side of the balance simply because it was considered under both factor (a) and factor (b) of section 190.3." (*People v. Holt, supra,* 15 Cal.4th at p. 695.) Any error therefore was harmless.

 Defendant further argues the trial court improperly counted the Benintende homicide twice under section 190.3, factor (a) (the circumstances of the crime) by counting that homicide both as a special circumstance (multiple murder) and as a "circumstance[] of the crime." (See *People v. Ashmus* (1991) 54 Cal.3d 932, 997 [2 Cal.Rptr.2d 112, 820 P.2d 214] [improper to count the same conduct under both " '[t]he circumstances of the crime' " and " 'the existence of any special circumstances' " under section 190.3, factor (a)].) He contends only the circumstances of the capital crime— that is, the Clark homicide—could be considered as "circumstances of the crime" under factor (a). Defendant is mistaken on both counts. The trial court explained: "The first thing the jury was asked to look at in determining the fate of Mr. Rogers were the circumstances of the crime of which he was convicted and the existence of any special circumstances found to be true. [¶] And of course, they did find special circumstances to be true. [¶] They found the defendant in this proceeding had been convicted of more than one offense of murder in the first or second degree." Then, after reviewing all of the other factors, the court stated: "And when you take into consideration the circumstances of these crimes charged in this case and the circumstances of other crimes that came out, I think the penalty of death is not unreasonable, and the court will impose it." Accordingly, it is apparent that the trial court first properly considered simply the existence of the multiple-murder special circumstance under " 'the existence of any special circumstances found to be true.' " (See *People v. Ashmus, supra,* 54 Cal.3d at p. 997 ["under the heading of 'the existence of any special circumstances found to be true,'

[factor (a)] reaches merely the presence of any such special circumstances"].) Second, the trial court properly considered the conduct underlying the Benintende homicide as a "circumstance[] of the crime of which the defendant was convicted in the present proceeding." As we have explained, "we have assumed that factor (a), though it speaks in the singular of the 'crime' of which defendant was currently convicted, covers the 'circumstances' of *all* offenses, singular or plural, that were adjudicated in the capital proceeding." (*People v. Montiel, supra,* 5 Cal.4th at p. 938, fn. 33.) No error appears.

Defendant next asserts the trial court improperly considered whether defendant in the future would pose a danger to prostitutes. In discussing section 190.3, factor (b) (other criminal activity involving force or violence), the trial court stated: "But I think that his actions with Tambri Butler shocked me almost more than any other case I have ever heard. [¶] The use of a cattle prod or the taser or whatever you call it, and the firing of the shot across the bridge of her nose, and requiring her to engage in all of these various and sundry sexual activities, that probably influenced the jury, in my view, and this court more than any other because not only has it happened once with Janine Benintende, twice with Tracie Johann Clark; we know it happened with [Ellen] Martinez; we know it happened with Tambri Butler. [¶] How many more times did it happen? But even more importantly, how many more times in the future might it happen?" Then, at the conclusion of its summary of the aggravating and mitigating circumstances, the trial court stated: "And so, the court weighing all of them has determined that this man is a danger to a certain segment of society, and maybe all of society."

We believe the trial court's comments, read in context, properly were addressed to the circumstances of the crime and defendant's criminal history. Defendant argues that the trial court erred because it focused on his dangerousness to prostitutes, an irrelevant consideration in view of the circumstance that life in prison without possibility of parole, or the death penalty, were the only possible penalties. Even if the court erred to the extent it focused on the danger defendant would pose to prostitutes, defendant was not prejudiced. The trial court mentioned only briefly defendant's dangerousness to prostitutes. The court did not place undue emphasis on this factor. We do not believe there is a reasonable possibility the trial court would have ruled differently had it not considered defendant's future dangerousness.

Defendant contends the trial court improperly relied upon the Martinez incident as an aggravating factor. He contends that incident was not properly before the jury under section 190.3, factor (b), because it did not constitute a crime and there was no evidence of force, violence, or the threat to use force or violence. The Attorney General asserts defendant's conduct came within the prohibition of several criminal statutes, including false imprisonment

(§§ 236, 237), false arrest under color of authority (§ 146), and committing a lewd act in public (§ 647, subd. (a)), and that defendant's statement to Martinez that he was going to take her "downtown" was a threatened arrest and thus a threatened use of force. In the alternative, the Attorney General argues Martinez's testimony was relevant to section 190.3, factor (a), the circumstances of the capital crime, because it was the brief termination of defendant's employment resulting from Martinez's complaint that provided defendant with the motive to murder Clark. We need not resolve this dispute. Even if the Martinez incident was not properly before the trial court in the context of its ruling on the automatic motion to modify the verdict, any error was harmless. The trial court mentioned that incident only once, and then only briefly, after recounting the facts of the Butler incident. It is evident the trial court based its ruling primarily upon the circumstances of the Clark murder, the Butler incident, and the lack of substantial evidence in mitigation. There is no reasonable possibility any error affected the trial court's ruling on the motion.

Defendant next asserts the trial court improperly considered a "pattern of violence." He contends this is not a proper factor in aggravation, because it does not fit any of the statutory criteria and also was not supported by the evidence. We disagree. The trial court mentioned the so-called pattern of violence only after it had denied the motion to modify, when it was discussing the sentencing considerations outlined in the probation report. No error appears.

Defendant finally contends the trial court disregarded or forgot the bulk of the mitigating evidence. In discussing such evidence, the trial court stated: "This man has no criminal record and that is a factor in mitigation. Defendant would have us believe that he committed these acts while under the influence of extreme mental or emotional disturbance, and I don't believe it, and neither did the jury." The court then reviewed the other mitigating factors mentioned in section 190.3, including whether the victim was a participant, whether defendant believed the killing was morally justified, whether defendant acted under duress or the domination of another person, whether defendant had the capacity to appreciate the criminality of his conduct, defendant's age, and whether defendant was an accomplice, finding that these circumstances did not mitigate the crimes committed by defendant. The court then stated: "And I couldn't think of any other extenuating circumstance in this case." Defendant contends the trial court disregarded the evidence of his record of service as a deputy sheriff, the love defendant's family felt for him, and his remorse for the Clark killing. But a trial court is not required to mention every item of evidence it reviewed in ruling on the automatic motion to modify. (*People v. Frierson* (1991) 53 Cal.3d 730, 752 [280 Cal.Rptr. 440, 808 P.2d 1197].) Here, as in *Frierson,* we find no indication in the record that the court ignored or overlooked defendant's mitigating evidence. Rather, the

court simply found that the mitigating evidence presented by defendant did not amount to an extenuating circumstance and thus did not outweigh the aggravating evidence. No error occurred.

In sum, there is no reasonable possibility that any errors or assumed errors, singularly or in combination, affected the trial court's ruling on the motion to modify. Thus, any related claimed federal constitutional error would be harmless beyond a reasonable doubt.

### K. *Constitutionality of the method of execution*

Under subdivision (b) of section 3604, the punishment of death is imposed by the administration of lethal injection unless the prisoner chooses lethal gas. Defendant contends both methods of execution constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. "As this court repeatedly has recognized, however, such claims are not cognizable on direct appeal, because 'an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal.' [Citations.] On direct appeal, defendant is restricted to claims 'bear[ing] on the validity of the death sentence itself.' [Citation.]" (*People v. Cornwell* (2005) 37 Cal.4th 50, 105–106 [33 Cal.Rptr.3d 1, 117 P.3d 622].) Moreover, defendant's "attack on illegalities in the execution process that may or may not exist when his death sentence is carried out are premature." (*People v. Boyer, supra,* 38 Cal.4th at p. 485.)

### L. *Asserted cumulative error and prejudice*

Defendant contends the cumulative effect of errors committed at the guilt and penalty phases denied him a fair trial and due process of law, requiring reversal of the penalty judgment. In particular, he points to guilt phase instructional errors and improper introduction of evidence of his firing over the Martinez incident. We have concluded the evidence concerning the Martinez incident properly was introduced, and the instructional errors cumulatively did not affect the result at the guilt phase. With regard to the penalty phase, the sole errors or assumed errors we have found involved jury instructions. Each was harmless individually. When considered cumulatively with the guilt phase errors, we likewise find no reasonable possibility that a different penalty verdict would have been rendered absent these errors. The errors therefore were harmless beyond a reasonable doubt. Finally, the errors or assumed errors committed in ruling on the automatic motion to modify the verdict provide no basis for reversal.

## III. DISPOSITION

We affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.